STATE of Missouri ex rel. STATE HIGH-
WAY COMMISSION of Mis-
souri, Plaintiff,

v.

Angelo A. VITALE and Frances Vitale,
Defendants-Appellants,

Sarah Tenenbaum, Defendant-Respondent.

No. 51826.

Supreme Court of Missouri,
Division No. 2.

Jan. 9, 1967.

*Motion for Rehearing or to Transfer to Court
En Banc Denied Feb. 13, 1967.*

James Daleo, James N. Cameron, Kansas City, for appellants.

Julius C. Shapiro and Julius Peltzman, Kansas City, for respondent.

EAGER, Presiding Judge.

This appeal involves solely the apportionment of a condemnation award as between the owner and a lessee. The property was located at 3213–3215 East 15th Street in Kansas City; it was taken for the 15th Street Trafficway. The date of the taking was March 26, 1959; the total award of $44,725 was paid into court. Exceptions were filed and they were apparently allowed to remain pending until February, 1964, when all the parties agreed upon a total award of $47,500, and the additional sum was also deposited. The present issues were first raised by the owner, Sarah Tenenbaum, who filed her motion on May 28, 1964, for apportionment; on June 3, 1964, the lessees, Angelo A. Vitale and his wife, likewise filed their motion. It is not necessary to state the allegations of these motions. After a rather extensive hearing, the trial court apportioned the sum of $13,015.20 to the lessees and $34,484.80 to the owner by its judgment entered on July 29, 1965, and filed its memorandum opinion which was also adopted as its Findings of Fact and Conclusions of Law. The lease here in question was to Angelo A. Vitale alone and, despite the joinder of his wife in the motion and notice of appeal, we shall generally refer to appellants as the "lessee."

Sarah Tenenbaum was a widow at the times in question, and she is recognized here as the owner of the land. We shall refer to her as the lessor. The lessee has appealed.

Vitale, the lessee, first took possession of the premises about 1944, presumably by assignment from another lessee; that lease ran, either by its terms or through an option of renewal, to August, 1953. He first built a fruit stand and operated it, and later enlarged the building to accommodate a grocery store. By November, 1952, he had apparently started the operation of a restaurant, having done some remodeling in order to accomplish that. In February, 1953, he negotiated the present lease with the owner, somewhat in advance of the expiration of his term because he wished to improve the premises further if he procured a new lease. Thereupon he enlarged the building for the operation of his restaurant. When thus completed, it was of concrete block construction, both outer walls and inner partition walls, and it was approximately 52 feet by 63 feet in size; he necessarily installed a considerable amount of restaurant fixtures and equipment. Some of this was affixed to the building in such manner that it could not, as a practical matter, be moved. Much of the equipment was movable. He thus continued the operation until he received notice to vacate; when computed from the date of the taking his lease had an unexpired period of approximately four years and five and one-half months, considered by most of the witnesses as fifty-four months; the actual term of the lease was from September 1, 1953, to and including August 31, 1963.

The provisions of the lease material here were in substance as follows: that the rent was $100 per month for five years, $125 per month thereafter; that lessee would erect at his own expense a suitable building for the operation of a restaurant; that lessee would keep all improvements in good repair, and surrender the premises at the expiration of the lease in good condition; that lessor might sell the premises at any time after September 1, 1955, upon

notice, in a bona fide sale, but should reimburse the lessee at the rate of $\frac{1}{120}$th of the cost of his building for each month of his term remaining; that lessee should pay all increase of real estate taxes over the 1943 taxes, and should carry and pay for insurance against fire and other hazards. We quote one paragraph, since much of our present controversy arises from it: "Until the termination of this lease, all structures, buildings, store rooms, fixtures, machinery and equipment contemplated and hereafter placed, located or constructed by lessee upon the premises, shall be considered and treated as belonging to, and the ownership in, lessee, but all of the same, and any and all right, title and interest which lessee may have at any time in or to the same shall all be, and stand charged, with a lien in favor of lessor to secure the faithful performance by lessee of each and all of the terms, covenants and agreements herein contained. Provided, however, that upon the termination of this lease, either by passage of time or otherwise, said structures, buildings and store rooms shall remain affixed to the real estate and shall become the property of and belong to the lessor."

Three realtors, with considerable experience in appraisal work, testified, two for the owner and one for the lessee. Both of those who testified for the owner stated that the proper method of evaluation of the lessee's interest was to deduct his actual annual rent, taxes, insurance and maintenance from the "economic" annual rental value of the property, multiply the difference by the number of years remaining, and then to reduce this sum to its present value according to the recognized "Inwood" table. One of these witnesses had previously appraised the whole property for the Highway Commission at a figure of $40,500; however, assuming the greater value agreed upon, he testified that the land was worth $9,750, and all of the improvements $37,750, with a depreciated value on the improvements at the end of the lease, of $33,975. He added to the last figure, $5,329, which he computed as the value of the income to the lessor, making a total of $37,600 as the lessor's share. As to the lessee, he fixed the "economic" rental value (what this or a similar property would rent for in the open market) at $4,800 per year, the actual rent at $1,500, the lessee's taxes at $470 (from information obtained), insurance at $250 and maintenance at $300; deducting all of these from the economic rent, the lessee thus had a net value or net "profit" under the lease of $2,280 per year. After proceeding as outlined above, using a remaining term of four and one-half years, and discounting the aggregate to its present value under the generally accepted table, he arrived at a net value of $8,525 for the lessee's interest.[1] The other expert witness for the owner followed the same method and used substantially the same figures; his net valuation of the lessee's interest was $8,300.

The appraisal witness for the tenant testified that the fair rental value of a comparable place would be $500 per month, and that he appraised the fair value of the lessee's remaining term at $20,625. He did not go into any detail in giving this opinion. He had viewed the premises several years earlier, apparently at the beginning of the condemnation. There was evidence concerning the cost of parts of the building and of valuations placed upon the various fixtures, both movable and otherwise. This, we need not set out. We assume that all fixtures which were movable were taken out when the lessee vacated, and no one has indicated otherwise.

The trial court adopted the method of leasehold valuation used by the owner's witnesses, but adopted the economic value of $500 per month fixed by the lessee's witness; as already indicated, it thus arrived

---

1. It may be noted that the total of the two interests thus computed does not equal the agreed award; however, the trial court took this into its consideration.

at a value of $13,015 for the lessee's interest.

The principal bone of contention here arises from the lessee's construction of the "ownership" provisions of the lease. His counsel say, in effect, that the ownership of the improvements was thus placed in lessee, by agreement, until the termination of the lease, that he was the owner of all improvements at the time of the taking, and that he is not only entitled to the value of the remaining term of his lease, but also to the value of all improvements, including the building and the fixtures. They insist that the court placed the ownership of all improvements in the lessor as of the time of the taking and thus erred. The lessee does not ask that we reapportion the award and enter judgment here, but does ask that we reverse and remand the case for a new apportionment in accordance with his theory. Much is also said concerning the provision of the lease that upon termination "by passage of time *or otherwise*" the improvements shall become the property of the lessor. The lessee argues, as to this, that the parties merely had in mind a termination of the lease by a sale of the property, a default of the lessee, an assignment for the benefit of creditors, or bankruptcy; counsel say further that if a reversion to the lessor upon condemnation had been intended, it would have been very easy to say so expressly; and that the trial court has misconstrued that provision. Counsel have cited cases to the effect that language similar to the "or otherwise" phrase is used in the "ejusdem generis" sense, namely, as referring to some other cause of the same general type. In Re Willcox, 165 App.Div. 197, 151 N.Y.S. 141; Siggelkow v. Arnold, 187 Minn. 395, 245 N.W. 629. Thus, they say that the exercise of the power of eminent domain here did not work an automatic termination which would cause the ownership of the improvements to revert to the lessor. Under our construction of the lease we do not deem it necessary to consider that particular phrase further. But we note that on lessee's argument that the "or

otherwise" was not applicable and did not work a termination, the lease merely continued (in theory, at least) for four and one-half more years, at which time the ownership of all improvements would vest in the lessor.

The wording of this lease in regard to "ownership" is peculiar; but one thing is certain, namely, that at the end of the term reserved in the lease, namely, August 31, 1963, the title to all improvements which had become a part of the realty reverted to and became the property of the lessor. Any "ownership" placed in the lessee was actually temporary, and why such provisions were included in the lease we do not know. Under these provisions the lessee was actually entitled only to the use of the improvements for the full term of the lease, and the fact that the lease was terminated by condemnation before its normal expiration would not operate to give the lessee the full value of the improvements; in other words, when the property was taken the improvements were still charged with the reversionary interest. We thus hold that the method of valuation followed by the lessor's witnesses was correct, and that the lessee was not and is not entitled to an added increment for the value of the improvements. If any further corroboration were necessary, it may be found in the rather specific provisions for the reservation of a lien on all improvements in favor of the lessor; and indeed the provision that the lessor might sell the property with all improvements and pay the lessee a proportion of the cost adjusted to the remaining term of the lease demonstrates per se that the lessee's interest in the improvements was to be consumed during the lease and was not an absolute ownership at any given time.

Counsel have cited a few cases indicating that a lessee was entitled to the value of his improvements, but they are cases where the lessee was specifically given the right to remove the improvements at the end of the term. Finney's Trustees v. St. Louis, 39 Mo. 177; City of Ladue v. St.

**178**

Louis Public Service Co., Mo.App., 168 S.W.2d 966; Schneider v. Bulger, Mo.App., 194 S.W. 737; Hopper v. Davidson County, 206 Tenn. 393, 333 S.W.2d 917; and see annotation in 3 A.L.R.2d at 302 for a statement of the principle. The lessee in our case had no such right and the authorities are inapplicable; indeed, the present lease expressly provided that upon its termination the structures and buildings "shall remain affixed to the real estate and shall become the property of and belong to the lessor."

■ In the absence of provisions in the lease to the contrary, we hold that the method followed here, and approved in the case of Land Clearance for Redevelopment Corp. v. Doernhoefer, Mo., 389 S.W.2d 780, was and is the correct method of evaluation of the lessee's interest upon condemnation. The evaluation there approved was the present value of the difference between the fair rental value of the premises and the "rent reserved in the lease," figured over the balance of the term. The court there referred merely to the "rent" reserved in the lease, without consideration of other expenses to which a lessee might be subjected, such as taxes, insurance and maintenance. The opinion in that case did not show that the lessee was required to pay for those items. We do not construe the opinion as actually restricting the consideration to rent alone where the lessee is required to pay such additional expenses, but that it would permit the inclusion in the computation of such other expenses, directly connected with the real estate, as the lessee is required to pay by the terms of the lease. And see, specifically, on this point Jahr, Eminent Domain, § 130, pp. 191, 193; People ex rel. United States Rubber Co. v. Knapp, 232 N.Y. 153, 159, 133 N.E. 429. Lessee's attempted distinction of the Doernhoefer case on the ground that the lessee there did not own the improvements, has already been answered.

■ We conclude that there is no justification for adding the value of the improvements to the computed valuation of the remaining term of Vitale's lease. The figures actually used by the trial court were adopted as part of its findings of fact, and depended largely upon the court's view of credibility. We find nothing "clearly erroneous" in its computations or its result. The lessor asks us to charge the lessee's share of the award with interest on the lessor's share from July 29, 1965, the date of judgment. We do not regard this as a situation where the allowance of interest is mandatory, and in our discretion we decline to allow it. The claim of lessor for damages for vexatious appeal is without merit and is disallowed. The costs of this appeal will be assessed against appellants, and the judgment is affirmed.

All of the Judges concur.