STATE of Missouri ex rel. STATE HIGH-
WAY COMMISSION of Mis-
souri, Relator,

v.

E. A. SAMBORSKI, Alice N. Samborski, and
Ruby Caldwell Kenworthy, Respondents,

and

Sun Oil Company, Appellant.

No. 55189.

Supreme Court of Missouri,
Division No. 1.

March 8, 1971.

James P. Tierney, John H. Calvert, Kansas City, William B. Waters, Liberty, for respondents, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Hale, Coleberd, Kincaid & Waters, Liberty, of counsel.

Samuel J. Molby, Kansas City, S. Morton Rurtherford III, Tulsa, Okla., for appellant, Watson, Ess, Marshall & Enggas, Kansas City, of counsel.

HIGGINS, Commissioner.

Proceedings under Section 523.053, V.A.M.S., for distribution of $47,500 condemna-

tion award between landowners-lessors and lessee. The condemnor, State Highway Commission, paid the award into court and took no interest in this part of the condemnation action. The remaining parties waived a jury and went to trial on issues limited to a determination of lessee's interest in the award in which lessee claimed in excess of $23,000. The trial court determined and adjudged that landowners-lessors were entitled to the entire award; lessee has appealed.

On July 10, 1954, E. A. and Alice Samborski and Ruby Kenworthy owned adjacent tracts of land each with 100-feet frontage on U. S. Highway 69 in Claycomo, Clay County, Missouri. On that date both landowners entered into separate identical leases with Sun Oil Company of the front 90 feet of their tracts. Under the leases Sun could hold possession until September 1, 1974, by exercising 5-year extension options. Such options were exercised to retain possession until September 1, 1969. Sun erected a gasoline service station on the leased premises and commenced its operation in December, 1955.

Sun's improvements consisted of a 2-bay vitrified building with canopy, offices, and restrooms; two 4,000-gallon underground storage tanks; two pump islands each with two pumps; signs, floodlights, concrete and asphaltic entrances from Highway 69; underground wiring, piping, conduits, septic tanks, sewer facilities, waste oil facilities; gravel parking areas, and shrubbery. Sun was the owner of the buildings, fixtures, and improvements, and had the right to remove same.

Sun operated the station by sublessee operators. The first operated from December 1955 to March 1960. Eight other sublessees were at the station from March, 1960, until July 1, 1966. The station was not operated after July 1, 1966, and the leased premises were taken by condemnation proceedings for Route I-435 in which the commissioner's report was filed March 13, 1967, and the award was paid into court April 7, 1967.

Between 1957 and 1959 it became common knowledge that Route I-35 would be opened and it was opened to traffic in December, 1959, or January, 1960. The opening of I-35 resulted in a diversion of interstate and through traffic from Highway 69 at the site of the leased premises.

In 1963 it became common knowledge that yet another highway improvement would take place in the area. This latter improvement was by way of I-435, and these premises were taken for that purpose by the present condemnation proceedings instituted in October, 1966.

In 1962 changes occurred in Missouri gasoline taxes and taxing procedures and a gasoline tax advantage previously enjoyed by service stations located in Claycomo was lost to this operation.

During operation of the station Sun paid and accounted in accordance with the leases for all rents and taxes, the last quarterly settlement for same being made with landowners-lessors September 19, 1966. During its operation, Sun experienced difficulty in procuring sublessee operators and, in four quarterly periods, there were no sales made or rents paid. There was no base or guaranteed rent; rentals were contracted at 1 to 1.12 cents per gallon of gasoline sold. No gasoline was sold from the quarterly periods June 1, 1962, to August 31, 1962, September 1, 1962, to November 30, 1962, December 1, 1962, to February 28, 1963, and December 1, 1963, to February 28, 1964. Total rental paid through the entire term of the lease was $11,004.14. The last sublessee operator gave up July 1, 1966, and Sun was unable to secure a sublessee after that date. Sun never undertook to use its own personnel or employ an operator at any time when no sublessee was present, and the station was out of operation for several periods, one of which lasted eleven months.

Sun paid Clay County and Claycomo real estate taxes for 1966 and 1967 on the premises, as required by the leases, and had obtained its merchant's licenses through 1967. On February 13 and 14, 1967, lessors

mailed written notices to Sun purporting to accept a claimed abandonment of the premises by Sun by virtue of nonoperation of its station, to request removal of improvements, and to demand possession.

Exhibits and admissions showed the following record of gallonage sold, operation, and chronology of significant events during Sun's operation of its station on the leased premises:

| Lease Year | Annual Gallonage | Average Monthly Gallonage | Sublessees | Significant Events |
|---|---|---|---|---|
| 12/55–12/56 | 112,547 * | 9,379 | Bond | Station opened. |
| 12/56–12/57 | 134,600 | 11,217 | Bond | Notice that I–435 would be constructed. |
| 12/57–12/58 | 175,250 | 14,604 | Bond | |
| 12/58–12/59 | 223,696 | 18,641 | Bond | |
| 12/59–12/60 | 91,574 | 7,631 | Bond to 3/60 Knipker to 6/60 Williamson to 12/60 | I–35 opened 12/59. |
| 12/60–12/61 | 86,475 | 7,206 | Roberson | |
| 12/61–12/62 | 28,400 | 2,367 | Roberson to 2/62 Rutherford | Gasoline tax advantage lost. |
| 12/62–12/63 | 57,376 | 4,781 | Rutherford to 4/63 Jones | |
| 12/63–12/64 | 90,049 | 7,504 | Jones to 6/64 | |
| 12/64–12/65 | 49,027 | 4,086 | Wollard to 8/65 Woolston | |
| 12/65–12/66 | 47,476 | 3,956 | Woolston to 7/66 | Station closed. |
| 12/66 to 4/7/67 (Date of taking) | 0 | 0 | | |

———◆———

B. E. Franke of Tulsa, Oklahoma, was the coordinator for construction for the southern division of Sun Oil Company, DX Division. He placed the "fair market value of the physical improvements" on the leased premises on the date of taking in March, 1967, at $23,700. He admitted it was not economically feasible to remove the station, paved spaces, and underground facilities from the premises and that Sun recouped salvage value of $1,376.87 from removal of certain equipment. Mr. Franke stated that a station design and style depended upon anticipated gallonage and he estimated that this unit was "pegged to do in the eighteen to twenty thousand per month range."

Keith DeLacey, also of Tulsa, was the senior real estate representative for condemnations and appraisals for Sun Oil, DX Division. He recognized problems with the station as early as 1962. " * * * the result was that the gallonage had gone far below its desired amount. The cause for the result was due to an indication that this property would be taken through condemnation." He also admitted that the opening of I–35 had adverse effects on gasoline sales on the leased premises in that major traffic left Highway 69 and went to I–35. The tax change produced a similar effect. In his opinion, the "fair market value of the physical improvements there on the leased property" at the time of taking was $23,045, and the highest and best use of the property was for a service station. His evaluation of the same after the taking was $1,376.87. Mr. DeLacey did not place any value on the remaining term of the leasehold "because there was not an economic value to the lease itself over and above the contract rent." In his opinion Sun Oil would not have been able to sell its leasehold interest. He also admitted that the

* Appellant's witness DeLacey states that the gallonage for the year ending 12/56 was 102,000.

site was chosen on a basis of 18,000 to 20,000 gallons sold per year. He stated that 4,000 gallons per year was a poor station, and that the gallonage sold at the station made it an "uneconomical" site and unattractive to potential operators. When a company attempts to sell a leasehold interest the buyer looks into what the station has produced by way of gallonage sales.

Norman Davidson of Independence, Missouri, was a real estate appraiser employed by landowners-lessors to appraise the various interests in subject property. In arriving at the "fair market value of the DX leasehold interest" on the date of taking, he assumed a conventional cent-and-a-half per gallon rental on the gallonage sold, resulting in a net profit of $233 per year to Sun; a 7 per cent return discounted by Inwood tables over the remaining seven years and five months of the lease, a value of $1183; added $750 actual salvage of station shell, and arrived at a leasehold value of $1933. The experience with this station indicated the sales were too low to permit Sun to amortize its estimated $32,000 in improvements over the life of the lease. Prior to acquiring knowledge of the low sales at the site, Mr. Davidson had estimated the leasehold value at $9,750 on the assumption that Sun had a "going business," but after "benefit of the gallonage set out in the interrogatories * * * my opinion changed radically." The appraisal was by "a summation of cost-less-depreciation; and in doing this I have estimated the replacement cost. I have estimated the physical depreciation and the economic obsolescence. And I have found after full investigation that this building contributes nothing; it's a liability." In his opinion the highest and best use of the leased premises immediately prior to the taking was "neighborhood shops of some type—hamburger stand or dry cleaners, or—anyway, a neighborhood service business." The gallonage record showed its best use was not service station operation.

Frank Miller of Liberty, Missouri, was in the real estate investment business, the oil business, and did appraisal work. He had examined the leases, the "prime factor" of gallonage experience, the physical property, and was familiar with service station operations and tax and highway changes in Claycomo. In his judgment, Sun's station was not economically satisfactory at its peak of 223,696 gallons sold in 1959. He felt the station would require a minimum of 19,000 gallons sold per month "to crack its basic overhead." In his opinion the "reasonable market value of the leasehold interest" held by Sun Oil Company was "zero. * * * It is my judgment that the station, at no place since the day it was built, performed well enough that a willing buyer would buy it." Sun's inability to keep sublessee operators "makes it obvious that the lessee was not in a position to make money; and without the lessee making money, then neither the oil company nor the landlords nor anyone else can make money. You've got to keep it open. * * * It's an obvious economic requirement to have a lessee in the station." He saw the improvements as a liability to the location and did not think the highest and best use was as a service station site. He had made a previous "sticks-and-mortar" evaluation of the improvements alone at $10,500, but gave no value to them in his total appraisal, made with knowledge of all the circumstances, and designed to separate the interests of the landowners-lessors and the lessee.

The court made the following pertinent findings:

"3. Defendant Sun Oil Company erected a service station facility on the leased premises and through sublessees began its operation on December 5, 1955. From this time until the end of 1959 the business showed steady growth, however, in December, 1959 the opening of an interstate freeway (I–35) paralleling U. S. Highway 69 diverted through traffic away from the service station facility. In the subsequent year the station's gallonage decreased by more than one half its previous year's total and management of the station changed hands three times. The gallonage of the station

continued to decline and in 1962 a tax advantage previously enjoyed by service stations in the city of Claycomo was removed. Throughout the period following the opening of I–35 the management of the station changed hands nine times and during the last five years of operation of the station the gasoline sold there averaged from four to five thousand gallons per month. Under such circumstances it was not economically feasible for a sublessee to operate the station nor was it economically feasible for defendant Sun Oil Company to operate the station through a salaried employee.

"4. On July 1, 1966 the defendant Sun Oil Company vacated the leased premises and ceased to operate a gasoline service station thereon. On February 13 and February 14, 1967, Mrs. Kenworthy and the Samborskis, respectively, mailed written notices to the defendant Sun Oil Company, stating that the leases were terminated by reason of defendant Sun Oil Company's cessation of operation of the gasoline service station facility and as a result of its abandonment of the leased premises. Such notices were received by Sun on our about February 15, 1967.

"5. In October, 1966 the State of Missouri acting through its Highway Commission, filed an action to condemn portions of the Samborski and Kenworthy tracts of land, including those parts which were subject to the leases. Duly appointed Commissioners appraised the land and filed their report on March 13, 1967. Thereafter the State Highway Commission paid the Condemnation Award into court on April 7, 1967. The defendants herein filed exceptions to the Commissioners' report and the award was subsequently increased to a total sum of $47,500 pursuant to stipulations of the parties and judgment of the court.

"6. The highest and best use of the condemned land was for a commercial retail business. Due to the location and other economic factors the premises were not suited for gasoline station purposes. Consequently the service station improvements

did not enhance the value of the land and were economically obsolete at the time of the taking.

"7. The lease, and all rights and obligations thereunder, including the unexpired term and the right to remove certain property from the leased premises, had no fair market value at the time of the taking (April 7, 1967) and had no fair market value on March 13, 1967."

The court then made the following pertinent conclusions:

"1. The value of the condemned property or any interest therein is the value of such property as of the date of the taking. The date of the taking was the date the Condemnation Award was paid into court, April 7, 1967.

"2. The leases obligated the defendant Sun Oil Company to operate a gasoline service station on the leased premises throughout the term of the lease. * * *

"5. If such leases were not duly terminated as provided above [by breach and termination, and abandonment and surrender], defendant Sun Oil Company's interest in the leases, including its interest in the unexpired term and its right to remove the buildings, fixtures and equipment from the leased premises, had no reasonable market value on April 7, 1967, nor on March 13, 1967, and therefore Sun is entitled to no share or participation in the Condemnation Award.

"6. The defendants Kenworthy and the Samborskis are entitled to the entire Condemnation Award of $47,500 and such amount shall be divided between them according to their respective interests therein."

Pursuant to the findings and conclusions the court entered judgment for the landowners in the full amount of the award, $47,500.

Trial by jury of the issues in this condemnation distribution proceeding was ex-

pressly waived by all interested parties; and, accordingly, this court must defer to the trial court's findings on conflicting evidence, and affirm the judgment unless clearly erroneous. Civil Rule 73.01(d), V.A.M.R.; State ex rel. State Highway Commission v. DeMarco, Mo.App., 445 S.W.2d 379, 382[1]. For other considerations affecting review of court-tried cases, see also Frisch v. Schergens, Mo., 295 S.W. 2d 84, 87; Pizzo v. Pizzo, 365 Mo. 1224, 295 S.W.2d 377, 385; Bowman v. Kansas City, Mo., 233 S.W.2d 26, 29; St. Louis Southwestern Ry. Co. v. Meyer, 364 Mo. 1057, 272 S.W.2d 249, 254.

The appeal briefs are revealing of the parties' approaches to the issue of value, if any, of Sun Oil's lease of the condemned premises.

Appellant's brief recites that "Sun Oil Company, as lessee, made no effort to show any so-called economic value to the leasehold estate. Rather, it concentrated, as was done in the Ladue case, [City of Ladue v. St. Louis Public Service Co., Mo.App., 168 S.W.2d 966 [1]], upon showing value in the improvements which it had constructed upon the leased ground which were in existence at the time court's appraisers valued the condemned property, and which were of value both intrinsically and as a revenue producing factor." In its reply brief appellant states it "simply did not offer any evidence as to so-called economic value as distinguished from value of the

right to use the improvements for the more than seven years remaining in the term of the lease." Under its theory appellant claims it is entitled to an evaluation of its improvements on the premises separated from the land itself, together with any interests therein and improvements thereon.

Respondents' brief recites that their approach "was based on the 'Unit Rule' [Nichols on Eminent Domain, Vol. IV, § 13.121(1), p. 371 [2]] in that the entire leasehold interest was the item to be evaluated and the improvements could be considered only as their use enhanced the value of the leasehold interest or what they were worth for the use to which they were employed as they stood on the land."

Along with these theories are certain other recognized legal propositions which bear on the propriety of this trial court's decision.

■ The general rule that the lessee, where the property is taken under eminent domain, is entitled to the reasonable market value of the unexpired term of his lease, derives from Biddle v. Hussman, 23 Mo. 597, where, as in this case, real estate subject to a lease was taken by eminent domain. The court announced that "The landlord was entitled to the present value of his reversion, and of the rents that were to become due to him during the continuance of the term, and the tenant to the

---

1. Tenant had the right to remove her buildings from leased property and was prevented from doing so by the taking, in which case the court held her "entitled to that part of the award which represents the value of the buildings, not because the buildings added to the value of the leasehold, but because the buildings belonged to her, and their value entered into the value of that which the city took." 168 S.W.2d l. c. 969.

2. "In the valuation process the unit rule is generally followed despite the provisions of the lease and regardless of the right of the tenant to remove the im-

provements. The tenant is generally not entitled to recover the value of the buildings or fixtures as a separate item in addition to the value of his leasehold interest. * * * The measure of damages is the increased market value of the leasehold interest by reason of the buildings and fixtures, deducting the value, if any, of the building and fixtures, for purposes of removal. * * * Hence, the structural value of the buildings and fixtures may be a fair test of what they add to the market value of the leasehold, if they are well adapted to the best use of the property."

present value of his leasehold interest over and above the rents payable during the term." 23 Mo. 1. c. 600.

The foregoing general rule applies also where the leased premises are improved with buildings and fixtures by the lessee as in the present case. This is well illustrated by Minneapolis-St. Paul M.A.C. v. Hedberg-Freidheim Co., Minn., 32 N.W.2d 569, 571–572[1, 2]: "It is perhaps axiomatic that where property is taken by condemnation * * * compensation should be made for the market value of the rights taken. Where the taking is of a leasehold interest, including a building on the leased land belonging to the tenant, the lessee is entitled to the market value of the leasehold and the building as a unit as compensation for the taking thereof. * * * True, under the lease, the [building] was to be regarded as between lessor and lessee as personalty, but for purposes of condemnation it was realty and was to be valued as such, for the plain reason that it was in fact realty and that it otherwise had no value except as salvage. * * * While evidence of the value of the unexpired portion of the lease and the building separately is admissible as bearing upon the value of the two as a unit, the market value is what a buyer would be willing to pay for them as a unit and not the sum of the values of each considered separately. The ultimate question always is, and the jury should be instructed, that the value is that of the property as a whole and not the sum of the values of the separate items composing it. Here, the question * * * was not what the leasehold and the [building] were worth separately as such, nor the sum of both those figures; but it was the price a buyer would be willing to pay for the leasehold with the [building], subject to the terms and conditions of the lease."

As stated in Land Clearance for Redevelopment Corp. v. Doernhoefer, Mo., 389 S.W.2d 780, 784[2, 3]: "* * * * the value of the leasehold should be determined from the testimony of qualified expert witnesses as that value which a buyer under no compulsion to purchase the tenancy would pay to a seller under no compulsion to sell, taking into consideration the period of the lease yet to run, including the unexercised right of renewal, the favorable and unfavorable factors of the leasehold estate, the location, type and construction of the building, the business of the tenant, comparable properties in similar neighborhoods, present market conditions and future market trends, and all other material factors that would enter into the determination of the reasonable market value of the property."

It should be noted also in reviewing the evaluation of this leasehold that "it is not true to say that every person who can properly be designated a lessee or sublessee is entitled to damages upon the taking of his interest in condemnation, for there are commonly recognized leasehold interests which are not sufficient to support a claim for a share of the compensation awarded to the fee owner when the property is appropriated to a public use." State ex rel. State Highway Commission v. DeMarco, supra, 445 S.W.2d 1. c. 383.

Application of these principles to the evidence in this case establishes support for the trial court's finding and judgment that the leasehold had no value at the time of its taking along with the fee interest in condemnation. From the evidence previously stated it reasonably could be found that at the time of taking the leasehold interest, including improvements, had no fair market value; that the improvements added nothing to the value of the land taken because they were designed for the sole purpose of a gasoline service station; that such service station was not the highest and best use of the leased premises, and it had history and experience demonstrating it to be economically unfeasible.

It may be, as suggested by appellant's presentation, that "common knowledge" of the station's projected demise af-

fected its value, but the threat of condemnation proceedings is not an element of damages for a taking in condemnation. St. Louis Housing Authority v. Barnes, Mo., 375 S.W.2d 144, 147; State v. Beck, Mo., 63 S.W.2d 814.

Appellant's authority, City of Ladue v. St. Louis Public Service Co., supra, does not govern this case because lessee's buildings in that case were shown to enhance the value of the land because they had value for the use for which they stood on the land. By contrast, there was evidence here to show that Sun Oil's service station was not the highest and best use of the land and its presence on the land was a liability rather than an asset. See City of St. Louis v. Turner, Mo., 55 S.W.2d 942, 944–945, that in condemnation nothing may be awarded for buildings unless they are adapted to the land and increase its market value.

■ Accordingly, it may be said that there was substantial evidence in "traditional form," expert and otherwise, State v. Douglass, Mo., 344 S.W.2d 281, establishing the lack of value of the leasehold; the trial court's finding was in accord, and the judgment entered pursuant to such finding may not be said to be "clearly erroneous," State v. Vitale, Mo., 411 S.W.2d 174. Being supported on such theory, it should be affirmed, Drydale v. Kiser, Mo., 413 S.W.2d 506, 507[2]; and it becomes unnecessary to review other questions briefed with respect to forfeiture, termination and abandonment of the lease.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.