LAND CLEARANCE FOR REDEVEL-
OPMENT AUTHORITY OF
KANSAS CITY, Missouri, Respondent,

v.

W.F. COEN & COMPANY, et
al., Defendant.

Appeal of ALLRIGHT AUTO
PARKS, INC.

No. WD39552.

Missouri Court of Appeals,
Western District.

April 25, 1989.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 30, 1989.

Application to Transfer Denied
Aug. 1, 1989.

Stephen Girard Mirakian, Kansas City,
for appellant.

Robert J. Campbell and Leland H. Corley, Overland Park, for respondent.

Before SHANGLER, P.J., and CLARK and FENNER, JJ.

SHANGLER, Presiding Judge.

The defendants Allright Auto Park, Inc. and Allright Carpark, Inc. [Allright], condemnees, bring these consolidated appeals from a judgment entered on jury verdicts on a trial of exceptions to the commissioners' awards in a condemnation action brought by Land Clearance for Redevelopment Authority of Kansas City, Missouri [LCRA] and from the judgment of apportionment entered by the court.

The subject of the condemnation and apportionment trials were three parcels of land located in the central business district. This land was for the site of the AT & T Town Pavilion development. The three lots, parcels 13, 14 and 15, constitute a surface parking area known as the *Kline lot.* Allright Auto Park was the fee owner of Parcels 13 and 15. Allright Carpark, Inc., a wholly owned subsidiary of Allright Auto Park, was lessee of parcel 14. LCRA, the condemnor, purchased parcel 14 in fee, subject to the lease, shortly before commencement of the condemnation proceedings.

The commissioners determined the fair market value of the Kline lot, and on March 12, 1984, LCRA paid the sum into the court registry and so acquired title to parcels 13 and 15. LCRA had already purchased the fee in parcel 14, subject to the Allright lease, on February 24, 1984. The parties filed exceptions to the commissioner awards and the issue of the fair market value of the parcels taken was tried to a jury. Prior to the trial of the exceptions, each party moved in limine to exclude certain valuation evidence to be tendered by the other. LCRA sought to exclude the Allright evidence of business profits—actual or prospective—from the operation of the property as a surface parking lot. All-right sought to exclude the LCRA evidence of comparable land sales. The court denied both motions.

The valuation methodologies and determinations presented by the parties were markedly disparate. Allright undertook to prove value through two expert economists, Burns and Faurot. They gave opinion that the highest and best use of the Kline lot was for continued use as a surface parking lot. They gave opinion also that the value of each parcel on the date of taking was $98 per square foot. That calculation represented the present value of future profits lost as a result of the taking. LCRA undertook to prove value through two expert appraisers, Nunnink and Arnote. They gave opinion that the highest and best use of the Kline lot was redevelopment or assemblage, but included interim surface parking. They gave opinion also that the value of each parcel on the date of taking was between $45 and $50 per square foot. That estimate of value was based on sales of comparable properties in the central business district. The jury returned a verdict of $64.80 per square foot for each parcel.[1]

The trial court then conducted a hearing under § 523.053, RSMo 1986, to apportion the jury award of $343,699.20 for parcel 14 between LCRA as fee owner and Allright as lessee. The value theories of apportionment, the bonus value method posited by LCRA and the summation method employed by Allright, were also markedly disparate. They will be fully explained in the course of opinion. The trial court entered detailed findings of fact and conclusions of law which expressly rejected the Allright theory of apportionment as inconsistent with Missouri law and generally accepted appraisal techniques. The court entered judgment of seven percent [7%], or $25,300, to Allright for its leasehold interest in parcel 14, and ninety-three percent [93%], or $318,399, to LCRA for its fee interest in parcel 14, the sum equal to the $343,699.20 fair market value at the time of taking as determined by the jury verdict.

---

1. The jury verdicts awarded $343,699.20 for parcel 13; $343,699.20 for parcel 14; $171,849.60 for parcel 15.

Allright preserves four contentions of error for our review: 1) that Instruction 6 and Instruction 7 which submitted fair market value as the standard and measurement of damages did not properly apply to the taking because the Kline lot was not subject to the usual fair market value tests, 2) that the trial court improperly received Exhibit 41, a computer printout prepared by an expert for LCRA, 3) that the trial court on the trial of the exceptions improperly precluded Allright from cross-examination regarding the source of funds to pay the condemnation verdicts, and 4) the trial court at the apportionment hearing improperly found the facts and declared the law in the rendition of that phase of the judgment.

## INSTRUCTIONS 6 & 7 & FAIR MARKET VALUE

Allright contends first that fair market value does not measure the damages in the condemnation of a surface parking lot, but rather that in such a taking, the present value of lost future profits from the use of the land is the best evidence of value. Allright argues, accordingly, that Instruction 6 [MAI 9.01] and Instruction 7 [MAI 16.02] which submitted fair market value, misdirected the jury, and that the refusal of the court to submit Instruction A tendered by Allright was prejudicial error.[2] The expounded argument is that our law recognizes that in the case of a surface parking lot, it is the character of the property itself and not the labor of the owner that makes the land valuable. The profits are derived directly, almost altogether, from the use of the land and so are the land's chief source of value. It was the Allright expert testimony, moreover, that the value of the parking lot was almost entirely dependent upon its location in the central business district, rather than upon improvements or operational and marketing efforts. The taking of the land is, therefore, tantamount to the taking of the business. Allright presented economist experts to project the future profits until February, 2008, [when the lease on parcel 14 expired] and then calculated the present value of the lost future profits by the application of a 10.5% interest rate—the formula prescribed by another Allright expert. This evidence, Allright argues, justified the submission of Instruction A under our decisions.

To sustain argument that the capitalization of profits was a valid method to prove the fair value of the surface parking lot taken in condemnation [and hence a valid basis for the submission of tendered Instruction A], Allright cites *Private Property for Municipal Courts Fac. v. Kordes*, 431 S.W.2d 124 (Mo.1968); *City of St. Louis v. Union Quarry & Constr. Co.*, 394 S.W.2d 300 (Mo.1965); *State ex rel. Highway Comm'n v. Mount Moriah Cemetery Ass'n*, 434 S.W.2d 470 (Mo.1968); and *Reorganized School Dist. No. 2 v. Missouri Pac. R.R. Co.*, 503 S.W.2d 153 (Mo.App. 1973). The rule of decision in those cases, however, is not as casual as Allright makes out. Those cases reaffirm that business profits do not usually bear as admissible evidence to prove the value of the land on which the business is located. That exclusion rests on the theory that such evidence is "too speculative, uncertain, and remote to be considered as a basis for computing

2. Instruction 6 [on the MAI 9.01 model] submitted:

   You must award defendants [Allright] such sum as you believe was the fair market value of defendant's property immediately before the taking on March 12, 1984.

   Instruction 7 [on the MAI 16.02 model] submitted:

   The term "fair market value" means the price which the property in question would bring when offered for sale by one willing but not obliged to sell it, and is bought by one willing or desirous to purchase it but who is not compelled to do so.

   In determining fair market value you should take into consideration all the uses to which the property may best be applied or for which it is best adapted, under existing conditions to be reasonably expected in the near future.

   Instruction A [a modification of MAI 4.01] tendered:

   You must award defendant such sum as you believe will fairly and justly compensate defendant [Allright] for any damages you believe defendant sustained and is reasonably certain to sustain in the future as a direct result of the taking by plaintiff on March 12, 1984, mentioned in the evidence.

or ascertaining the market value." *Union Quarry* at 306[12].

■ The *just compensation* our constitution mandates for private property taken for public use means, usually, *fair market value* of the property at the time taken. That is to say, what a reasonable buyer, who was willing but did not have to purchase, would give and what a seller, who was willing but did not have to sell, would take. *Id.* at 305[6–10]. The *fair market value* of property imports proof of sales of similar property in the community as the method to fix the value of the property taken. *Mount Moriah* at 472[2]. When the property is such that evidence of fair market value does not obtain, necessity requires a different formula to fix fair value. Thus, in the taking of such singular properties, as school yards, church yards, college campuses, buildings under construction, and cemeteries—properties without fair market value, the capitalization or even other method of valuation may be approved. *Id., Kordes* at 126; *Union Quarry* at 305[11]; *Reorganized School Dist. # 2* at 158. In any such case, where a business is conducted on the land taken in such a manner as to be inextricably interrelated, "so that an appropriation of the land means an appropriation of the business," evidence of net profits of the business may be allowed to prove the value of the land taken. The evidence of net profits, nevertheless, must be "clear, certain and easily calculable," so that conjecture "is minimized as far as possible...." *Union Quarry* at 306[13].

Allright argues that a surface parking lot comes within this allowable proof of land value by evidence of net profits of the business related to the land—and cites *Kordes.* The tracts taken in *Kordes* were operated as a parking lot. The court expressly found that its use "was related to and connected with the land so that appropriation of the entire tract appropriated the business." Moreover, the evidence of profits was clear. The witnesses also all testified that "the market data approach of comparable sales could not be used because the only sales were 'in the urban renewal

development' and were not arm's length transactions." *Kordes* at 125. It was only because there was no other way to arrive "at a fair market on it" that the evidence of the business profits was allowed. *Id.* at 126. In these singular circumstances, *Kordes* validated the capitalization of business profits method to determine the value of the land taken. *Kordes* does not treat a surface parking lot as a species of unique property nor—contrary to the Allright argument—sanctions evidence of business profits as a *per se* rule of proof of value when such land is taken. Rather, *Kordes* found that the absence of comparable sales rendered impossible an estimate of fair market value, and so allowed the opinion of fair value based upon the capitalization of business income method—but only because the evidence of profit was beyond conjecture and the business so interrelated with the property that the appropriation of the property was tantamount to an appropriation of the business.

■ If we assume that the Allright evidence of business profits was beyond conjecture and that the surface parking lot business was inextricable from the land [propositions in serious doubt], an essential premise to the validity of the business profits method of proof of value nevertheless lacks. There was abundant evidence of comparable land sales from which to determine the fair market value of the Allright surface parking lot. The appraisers for LCRA, Arnote, and Nunnink, identified many vacant land sales and sales of surface parking lots in the central business district, and relied on seven recent sales to arrive at the fair market value of the Allright parking lot. There is no contention that this testimony and opinion did not meet the standard of proof our decisions impose for such evidence or were not otherwise probative of the issue of fair market value. *See State ex rel. State Highway Comm'n v. Barron,* 400 S.W.2d 33, 36[3–13] (Mo.1966); *State ex rel. State Highway & Transp. Comm'n v. Roth,* 687 S.W.2d 662, 666[3–6] (Mo.App.1985).

The ultimate issue for submission to the fact-finder, therefore, was the fair market

value of the land taken totally in condemnation. The use of MAI 9.01 model for that purpose was mandatory, as was the definition of *fair market value* rendered by the MAI model. Notes on Use, MAI 9.01 and MAI 16.02. Instructions 6 and 7 were the mandatory and proper submissions under the evidence. Instruction A tendered by Allright and formulated as a modification of MAI 4.01 was properly refused.[3] The point of error is denied.

## EXHIBIT 41

The exhibit was a computer printout prepared by LCRA economist expert Olson on data already in evidence. Its purpose was to illustrate that the amount of future profits calculated by Allright experts Burns and Faurot could be drastically affected by a change in the assumptions of the calculations. Exhibit 41 was a printout of the results if a discount rate of 15%, rather than the 10.5% the Allright experts assumed, was used to calculate the present value of future profits. There was no dispute between the corps of experts that a higher discount rate would have a significant effect on the present value result. The complaint of prejudice seems to be that Olson testified in his deposition testimony that he had formed no opinion as to what the correct discount rate was for the stream of profits from the Kline lot as of the date of the taking. Olson simply disagreed that it was 10.5%—the rate which the Allright calculations of present value of the future profits assumed. That figure was too low. Allright thereupon objected to the admission of Exhibit 41, on the ground that the exhibit "purported to show a different value than [Allright's] by a witness who says he's not testifying to value." The purpose of the exhibit, as LCRA explained again to the court, was not an opinion of value, but only that the Allright calculations of present value depended on the assumptions and that the assumption of a

10.5% discount rate was too low. There was independent testimony from LCRA economist experts that 14.7% was the accurate discount rate for the purpose of the calculation as of the date of the taking. That transposed into 15% on Exhibit 41. It is difficult to understand the complaint of error, let alone of prejudice, from the admission of the exhibit. It did nothing more than illustrate the fallibility of the Allright methodology in the derivation of present value for the claim of future profits.

The motion for new trial asserts only: "The trial court committed reversible error by overruling Defendants' objection to Exhibit 41, a table of figures computed by Gerald Olson, purporting to show the value of the property in question by discounting the stream of profits at a 15% discount rate." The formal point lacks specificity to preserve a claim of error. *Jackson v. Radtke*, 673 S.W.2d 40, 47 (Mo.App.1984). The trial objection, although more voluble, is no more descriptive of what prejudice could have come to Allright by the admission of the exhibit. The point is denied.

## DENIAL OF CROSS–EXAMINATION AS TO THE SOURCE OF FUNDS

■ Allright contends also that it was reversible error for the court, at the trial of the exceptions stage of the litigation, to deny cross-examination of LCRA Executive Director Collins concerning an indemnity agreement between LCRA and the developer. As in the usual case in condemnations for private development, the condemnation authority—here LCRA—uses its power of eminent domain to acquire land suitable for development. The authority then sells the property acquired by eminent domain to the private developer to recover the acquisition costs. There was an agreement between LCRA and the AT & T Town Pavilion to reimburse the authority for the cost of the land acquired for the site of the building. The general rule of law in a

---

**3.** The evidence of business profits as a basis of the value of the parking lot was nevertheless before the jury, and was argued by Allright to the jury. At outset the trial court denied the Allright motion in limine to exclude evidence of comparable land sales as well as the LCRA motion in limine to exclude evidence of business profits as a basis for value. Although the court refused the tender of Instruction A, the evidence of business profits, quite anomalously, remained before the jury throughout.

condemnation case—as Allright acknowledges—is that the source of payment of a condemnation award is not relevant to the jury determination of damages. The only true issue in a trial of exceptions to a condemnation award is the fair market value of the property taken. *Kansas City Power & Light Co. v. Jenkins,* 648 S.W.2d 555, 559–565[14] (Mo.App.1983); *St. Louis County v. Seibert,* 634 S.W.2d 590, 592[2, 3] (Mo.App.1982). Accordingly, the trial court sustained the LCRA motion in limine to exclude evidence of reimbursement or reference to the agreement by the developers with the authority for that purpose.

■ Allright argues nevertheless that LCRA exposed the source of funds issue when the authority elicited from Collins that it was the obligation of the authority under the law, as the redevelopment urban renewal agency of Kansas City, "to participate in the removal of blight and prevention of the reoccurrence of blight in the City." That and other such testimony elicited by LCRA, Allright contends, was meant to leave the impression with the jury that "LCRA, as a public agency, would pay the condemnation award out of public funds." The misconception that the taxpayers foot the cost for any such taking, Allright asserts, in turn engenders the impression that the larger the condemnation award, the greater the burden to the taxpayer. The inevitable consequence is for the jury to award less money. To dispel the erroneous impression left with the jurors from the admission of such testimony, therefore, the trial court was obligated to allow cross-examination by Allright.

Allright cites *Del–Mar Redevelopment Corp. v. Associated Garages, Inc.,* 726 S.W.2d 866 (Mo.App.1987) for the holding that, although as a rule evidence of financial status of the parties to a condemnation proceeding is improper, "if one side opens up the matter of finances it no longer has the right to complain about further testimony or questioning along this line." *Id.* at 872[17, 18]. *Del–Mar* was a proceeding in eminent domain by a redevelopment authority of a car wash facility. In the course of the presentation of its evidence,

Del–Mar elicited testimony that "it was a non-profit community corporation whose purpose was to represent the residents of the community and to foster economic development of 'disinvested communities.'" *Id.* On cross-examination, the car wash drew out evidence that private investors owned part of Del–Mar, that they made a profit, that Del–Mar received governmental funding, and that a private company would lease the property taken from Del–Mar. In response to the Del–Mar contention that the cross-examination improperly probed the source of the funds to be used by the redevelopment authority to pay the condemnation award, the court found that the car wash "was only countering the impression and thrust of Del–Mar's evidence that the residents in the Del–Mar project area would be paying [the car wash's] damages." *Id.* In these circumstances, the court of review found neither abuse of discretion nor prejudice to the condemnor.

In contradistinction to *Del–Mar,* there was neither assertion, allusion or even intimation in the testimony of Executive Director Collins that LCRA was a non-profit agency. Nor was there any emphasis—as Allright argues—that the Kline lot was taken for a "public purpose." In the explanation of the function of the redevelopment authority, Collins explained simply that LCRA was "primarily involved in land acquisition for both public and private development in Kansas City." In that role, he elaborated, the authority assists both public and private entities to assemble the tracts for redevelopment. It could not but have been evident to the jury from the recurrent references to the AT & T Town Pavilion throughout the trial, as well as from the photographs of the completed construction allowed into evidence, that it was a private entity which had the stake in the exercise of eminent domain by LCRA. *Del–Mar* merely reaffirms that the source of funds for the payment of a condemnation award is not a relevant issue in such a litigation. The evidence elicited by LCRA that its role as redevelopment authority is to acquire land for that purpose for both public and private entities does not compromise that rule. There is no reasonable

basis in the Collins testimony for the inference Allright argues that the taking for the AT & T site would be paid out of public funds, and hence chilled the award returned by the jury.

## THE APPORTIONMENT OF THE JURY AWARD AS TO PARCEL 14

At the trial of the exceptions, the value of each property, parcel 13, 14 and 15, was determined by the jury as though each was owned in fee simple by Allright. At the time of the taking, parcel 14 was owned in fee by LCRA and was subject to a noncancellable lease in favor of Allright on which a term of 288 months [24 years] remained. The jury returned an award of $343,699.20 as the fair market value of parcel 14. The trial court thereupon apportioned the respective interest of the landowner and the tenant in the award returned by the jury— as required by § 523.053, RSMo 1986. The court allocated 7% of the award [or $25,-300] as its bonus value in the lease to Allright and 93% of the award [or $318,399] to LCRA as fee owner.

Allright acknowledges that appellate review of the apportionment adjudication is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Allright does not argue that the apportionment judgment does not rest on evidence, but that the trial court came to decision by a misapplication of the law to the facts, and hence its judgment is owed no deference. In particular, Allright contends that the court erroneously declared that the summation method of apportionment was not applicable to the case. That method derives the value of the leasehold interest by first valuing the interest of the fee owner [a combination of the income stream and the reversion], then subtracting that sum from the jury award, and allocating the balance as the interest of the lessee. The trial court expressly declared, rather, that the jury award for parcel 14 must be apportioned according to the bonus value method—as approved by our supreme court in *Land Clearance for Redevelopment Corp. v. Doernhoefer*, 389 S.W.2d 780 (Mo.1965). That method apportions to the fee owner the entire award less any bonus value which the lessee may be able to prove in the lease. The trial court rejected the summation method as inconsistent with *Doernhoefer*.

A lessee of property taken by eminent domain is entitled to the reasonable market value of the unexpired term of its lease. *State ex rel. State Highway Comm'n v. Samborski*, 463 S.W.2d 896, 901[1] (Mo.1971). The rule declared in *Doernhoefer* [at 784] governs the law of apportionment in such cases:

> [T]he value of the leasehold should be determined from the testimony of qualified expert witnesses as that value which a buyer under no compulsion to purchase the tenancy would pay to a seller under no compulsion to sell, taking into consideration the period of the lease yet to run, including the unexercised right of renewal, the favorable and unfavorable factors of the leasehold estate, the location, type and construction of the building, the business of the tenant, comparable properties in similar neighborhoods, present market conditions and future market trends, and all other material factors that would enter into the determination of the reasonable market value of the property. *The bonus value, sometimes referred to as the leasehold savings or profit, is the difference between the economic rental and the contract rental. The economic* rental is the actual market value of the use and occupancy. [emphasis added].

According to the *Doernhoefer* principle, a lessee is entitled to apportionment of any *bonus value* the lessee has under the lease. The *bonus value* is the difference between the economic [or market] rental and the contract rental specified in the lease. Thus, under the *Doernhoefer* method a leasehold interest will have value only where the rent to be paid under the terms of the lease is less than the market rents being paid for comparable properties at the time of taking. *St. Louis County v. State Tax Comm'n*, 406 S.W.2d 644, 652[7–11] (Mo. banc 1966). Where the market rent is higher than the contract rent, the lessee will enjoy a rent savings, the value

of which must then be capitalized over the remainder of the lease term to derive present cash value. *Id.* Conversely, where the contract rent is equal to, or greater than, the market rent—there will be no bonus value in the leasehold interest. It is the sense of *Doernhoefer* that [as in this case] where a condemnation award is to be apportioned between a single lessee and a single lessor, the entire award must be allocated to the lessor unless the lessee can prove the existence of a bonus value. *See, Missouri Condemnation Practice,* § 7.14 (Mo.Bar 2d ed. 1988). The principle of apportionment *Doernhoefer* expounds has since been the rule of decision. *Frontier Airlines, Inc. v. State Tax Comm'n,* 528 S.W.2d 943, 947 (Mo. banc 1975); *State ex rel. State Highway Comm'n v. Vitale,* 411 S.W.2d 174, 178[2] (Mo.1967); *St. Louis County v. State Tax Comm'n,* 406 S.W.2d at 652.

There is no serious contention that the predicates for the bonus value determination as found by the court on the apportionment adjudication were not met by substantial evidence. There was expert evidence of comparable surface parking lot leases to determine fair market value—and hence the market rent of the Allright lease on the date of taking. There was expert evidence that the excess value of the market rent over the contract rent yielded a bonus value of $3,829 per year, or $319 per month for 288 months [the remainder of the Allright leasehold term]. There was expert testimony that the present value of $319 per month for 288 months was determined by the application of a 14.7% discount rate, so that a bonus value of $25,300 was established. In a word, there was substantial evidence to sustain the judgment of apportionment to Allright for $25,300 of the $343,699.20 returned by the jury as the fair market value of parcel 14.

Allright's cavil is not that the evidence for the findings of the apportionment entered by the court was not probative of the methodology prescribed by *Doernhoefer,* but that the court erroneously refused to apply the summation method of apportionment under the proofs adduced. Allright contends that *Doernhoefer* does not pronounce a peremptory rule for the determination the value of a leasehold interest taken in condemnation, but sanctions the method which suits the distinctive factors of value in evidence. Allright argues that there is an inherent distinction between a long term lease and a short term lease in the apportionment of value. A long term lease [Allright argues from the *Orgel* treatise] [4] emphasizes the importance of the right of the landlord to receive his rentals and minimizes the importance of the reversionary interest. Thus, in the case of a long-term lease, the proper theory of apportionment capitalizes the reserved rentals to determine the interest of the lessor, and the residue is allocated to the value of the leasehold. That is the summation method. In a short term lease, on the other hand, the apportionment is more fairly accomplished by the bonus value method, because [as cited from *Orgel*[5]] "[o]ne can here predict with a fair degree of confidence whether the excess of the rental value over the rent reserved is likely to continue for the remainder of the term." That is the bonus value method. Thus, the distinction in method is premised on the theory that the longer the lease, the closer it approximates fee ownership and the more speculative becomes the reversion value to the owner.

Allright argues that a twenty-four year lease [the term which remained on parcel 14] is a long-term lease, and hence more amenable to the summation method, and more equitable than the bonus value method applied in *Doernhoefer.* Allright does not explain what makes a lease long term, or when the distinction fades into a short term.[6] *Doernhoefer* establishes the bonus

---

4. 1 Orgel, *Valuation Under Eminent Domain* (2d ed. 1953).

5. At section 122.

6. *Orgel* acknowledges that "no formal doctrine distinguish[es] between the treatment of long-

term and short-term leases." The text alludes to a term of ninety-nine years as the paradigm of a long-term lease. *Id.* at § 122.

There was evidence before the apportionment court by the LCRA expert that a lender would not finance a redevelopment project for the

value method as the proper principle of apportionment in cases where leased property is taken by eminent domain. The application and efficacy of that method was not made to depend on the duration of the lease. In any event, the leasehold term in *Doernhoefer* to which the bonus value *method* was applied was 17½ years. The term which remain to Allright was 24 years—a virtual equivalent in economic terms.

The cases Allright cites for the argument that the value of a long-term lease is most fairly determined by the summation method virtually all involve leases with terms of years to run far in excess of the 24 years left to Allright. In *Edmund Realty Co. v. Walmer*, 123 F.2d 54 (8th Cir.1941)—the precedent Allright argues most insistently—the condemned property was encumbered by a 99 year lease with more than 61 years left to run at the time of the taking. Thus, even if the summation method was given approval in *Walmer* as the method of apportionment [a premise we doubt], the vast discrepancy in the lease term which remained there, renders *Walmer* inapposite. In *Dep't. of Public Works & Bldgs. v. Metropolitan Life Ins. Co.*, 42 Ill.App.2d 378, 192 N.E.2d 607 (1963)—also cited by Allright on the validity of the summation methodology—95 years remained on the lease. In *Chicago & Northwest Ry. Co. v. Chicago Mechanics Inst.*, 239 Ill. 197, 87 N.E. 933 (1909) 80 years remained, and in *Pennsylvania Ave. Dev. Corp. v. One Parcel of Land*, 670 F.2d 289 (D.C.Cir.1981), a 30 year lease with unexercised options for six 10 year renewal periods. They bear no resemblance in economic or market terms to a lease of 24 years as determinants of leasehold value.

The summation method, whatever its plausibility of fairness, operates from unfair premises. That method—which derives the value of the leasehold interest

from the total award less the value of the discounted rental income—treats market value as irrelevant, and thereby disregards the legitimate legal standard. *Mobil Oil Corp. v. Phoenix Central Christian Church*, 138 Ariz. 397, 675 P.2d 284, 287–288 (App.1983); *State v. Spencer*, 90 Wash.2d 415, 583 P.2d 1201, 1205 (banc. 1978). The measure of damages to a lessee, however, is the market value of what is lost. *State ex rel. State Highway Comm'n v. Samborski*, 463 S.W.2d at 901[1]. The summation method does not impose on the lessee who lays claim to a share of the condemnation award any burden to prove the value of the leasehold—that is, what the lessee has lost by the taking. Rather,

> [T]he difference between the value of the annuity and the total award is arbitrarily concluded to be the value of the leasehold estate. It is neither a measure of damages suffered by the lessee nor an approximation of the market value of the lease. Therefore, it is not in accord with either the spirit or the letter of the law. It is merely a convenient way of refusing to admit a lack of knowledge of current real estate value.

Boyer and Wilcox, *An Economic Appraisal of Leasehold Valuation in Condemnation Proceedings*, 17 U. Miami L.Rev. 245, 273 (1963).

The judgments are affirmed.

All concur.

---

holder of a 24 year lease because of the unduly short amortization period of such a term. It was the opinion of the witness that a lease under 30 years could not be financed, and typically a lender would expect a lease term of 50 to 100 years before undertaking to finance a redevelopment project. It may be that where, as here, the highest and best use of the property

encumbered by the lease and taken in condemnation is for redevelopment, a long-term lease is functionally defined by the term of years which, under market conditions, would induce an investor to finance a redevelopment project on the land encumbered by such a lease. It is a question that neither *Doernhoefer* nor its sequels were called upon to answer.