ST. LOUIS COUNTY, Missouri, Plaintiff,

v.

BOATMEN'S TRUST CO., et al.,
Defendants/Appellants,

v.

CONSTRUCTION DEVELOPERS,
INC., Defendant/Respondent.

No. 62219.

Missouri Court of Appeals,
Eastern District,
Division Three.

June 15, 1993.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 14, 1993.

Application to Transfer Denied
Aug. 17, 1993.

Robert B. Hoemeke, Robert J. Will, St. Louis, John G. Young, Jr., Clayton, for defendants, appellants.

Gerard T. Carmody, Elizabeth C. Carver, Mark B. Leadlove, St. Louis, for defendant/respondent.

GARY M. GAERTNER, Presiding Judge.

Appellants, Boatmen's Trust Company, et al., appeal from an Order of Distribution entered in the Circuit Court of St. Louis County apportioning 95.4% of a Condemnation Commission's awards of damages to respondent, Construction Developers, Incorporated ("CDI").[1] We reverse.

On April 15, 1991, the plaintiff in this action, St. Louis County,[2] filed a Condemnation Petition in the Circuit Court of St. Louis County. Plaintiff was seeking to acquire two parcels of land, part of the St. Louis Galleria Shopping Center's ("Galleria") parking lot, for purposes of widening Brentwood Boulevard and installing a right turn-lane from eastbound Clayton Road to southbound Brentwood Boulevard. This road widening was required by plaintiff to accommodate the additional traffic generated by the Galleria expansion.

The parcels of land subjected to the condemnation were parts of larger tracts owned in fee simple by separate entities

---

1. CDI is a wholly owned subsidiary of Dillard's Department Stores, Inc.

2. St. Louis County is not a party to this appeal.

and leased to CDI. The Sansone Tract, originally leased by Andrew Sansone to Stix, Baer and Fuller Co.,[3] is now owned by a trust, with Boatmen's Trust Co. as trustee and successor in interest to Andrew Sansone. This tract, consisting of 34,075 square feet before the taking, became the subject of the lease in 1952. Said lease was for an initial term of 25 years, with renewal options for a second and third 25–year period.[4] The rent for the Sansone Tract was $4,000.00 per year for the first 25 years, and $5,000.00 per year during each of the option periods. Parcel No. 1, the condemned portion of the Sansone Tract, consists of 3,026 square feet of real estate.

The second tract of land, originally consisting of 56,813 square feet, is owned by William E. Cribbin as to an undivided ⅔ ownership interest and Kathryn Shirk Seidel, Julius A. Seidel, Jr., James E. Seidel and Richard B. Seidel, Trustees of the Julius A. Seidel Marital Trust, as to an undivided ⅓ ownership interest. This tract was the subject of a lease entered into by Eugenia Seidel and Stix, Baer and Fuller, Co. on June 30, 1953.[5] The lease was for an initial term of 50 years, at $10,800.00 per year, with an option to extend the lease for an additional 25 years at $12,000.00 per year for each year of this option period. Parcel No. 2, the condemned portion of the Cribbin–Seidel Tract, consists of 4,277 square feet of property.

Hycel Partners I, L.P. ("Hycel") is the developer and owner of the Galleria. Hycel, CDI, and other Galleria tenants and store owners are signatories to an Amended and Restated Reciprocal Easement Agreement ("REA").[6] Pursuant to the REA, CDI was required to irrevocably dedicate the Sansone Tract and the Cribbin–Seidel Tract for use by the REA signatories and Galleria customers as free parking for the term of the REA.[7] Additionally, the REA restricts CDI from using the two tracts for any purpose other than parking and restricts CDI from conveying or otherwise alienating or causing a default under the current leases.

■ Pursuant to the filing of St. Louis County's Condemnation Petition, the circuit court issued its Findings of Fact, Conclusions of Law and Order of Condemnation for Parcels No. 1 and 2 on July 22, 1991. At the same time, the court appointed Commissioners to determine the fair market value of the parcels to be awarded as damages. On July 30, 1991, the Commissioners convened a hearing. The Commission determined the fair market value of Parcel No. 1 to be $131,950.00 and the fair market value of Parcel No. 2 to be $149,695.00. The Commissioners' Awards were paid by St. Louis County into the registry of the circuit court on July 31, 1991.[8]

■ Neither lease at issue here addresses the disposition of proceeds from a condemnation of all or part of the leasehold estate. Because of this, Boatmen's and CDI, and Cribbin, the Seidels and CDI, were required either to agree to an apportionment of the Commissioners' awards, or to move the court for such a determination. On April 20, 1992, the parties herein filed motions for distribution with the circuit court.

On April 20th and 21st, 1992, a hearing was held to determine the order of distribution. The primary testimony at this hearing came from two appraisal experts: One testifying on behalf of CDI; and the other testifying on behalf of the fee simple owners. Although the testimony of the two coincided regarding some key elements, the

---

**3.** Through various assignments and mergers, CDI came to be the current lessee.

**4.** The first renewal option has been exercised.

**5.** Through various assignments and mergers, CDI came to be the current lessee.

**6.** Boatmen's and the owners of the Cribbin–Seidel Tract are not signatories to the REA.

**7.** The REA will expire August 1, 2090.

**8.** Boatmen's, Cribbin–Seidel, and St. Louis County have all filed exceptions to the Commissioners' Awards, which exceptions have yet to be tried to a jury. We note, however, pursuant to RSMo § 523.053 (Cum.Supp.1992), an Order of Distribution is a final, appealable order.

differences are what brought this appeal before us.

■ The experts agreed the method to be utilized in determining the parties' interests was the "bonus value" method of valuation. They confirmed the "bonus value" method of valuation requires a determination of the difference between the economic rental[9] and the contract rental[10] for the affected leasehold, which difference is discounted to present value. If the economic rental for a leasehold estate exceeds the contract rental, the economic advantage enjoyed by lessee under the lease is referred to as the "bonus value." The lessee is entitled to compensation for the "bonus value."

The experts also agreed the highest and best use for the parcels was as free parking for the Galleria. Finally, the two established the only method which could be used to determine the economic rental for the parcels required a "Sales Comparison Approach."[11] At this point, the experts' testimony diverged.

The appraiser for CDI provided evidence of thirteen properties which he described as comparable to the properties at issue. Based on the market value of these alleged comparables, CDI's appraiser opined the property at issue had a market value of $3.00 per square foot. Because the contract rent for the Sansone Tract was $.12 a square foot for the first 25 years, increasing to $.15 a square foot for the two additional 25 year renewal periods, and $.19 a square foot for the first 50 years of rent on the Cribbin–Seidel Tract, increasing to $.21 a square foot for the 25 year renewal period, the expert for CDI contended CDI had a "bonus value" under the leases for the two tracts of land. Based on this determination that a "bonus value" existed, CDI submitted its Findings of Fact and Conclusions of Law to the court suggesting that 95% of the Commissioners' Awards be ap-

portioned to CDI, and 5% apportioned to the fee owners.

Appellants' appraiser, on the other hand, could find no comparable leasehold interests or sales of leasehold interests of comparable properties. Additionally, the expert for appellants found CDI had lost nothing through the taking. As such, he concluded there was no "bonus value" associated with the leases at issue. Relying on the findings of their expert, Boatmen's and Cribbin–Seidel submitted Findings of Fact and Conclusions of Law whereby CDI, as lessee, received 0% of the Commissioners' Awards, with the fee owners being apportioned 100% of the awards.

On June 3, 1992, the circuit court entered its order holding there was, indeed, a "bonus value" under the leases. The court adopted, with only slight modification, the Findings of Fact and Conclusions of Law submitted by CDI. The court indicated it viewed the testimony of CDI's appraiser to be more credible than that of appellants' expert, and apportioned 95.4% of the Commissioners' Awards to CDI, and the remaining 4.6% to Boatmen's and Cribbin–Seidel for their respective parcels.

In addition, the court found the Commissioners' Award for Parcel No. 1 was based on incorrect square footage. As such, the Commissioners awarded $131,950.00 for the taking of Parcel No. 1. The court held the correct award should have been $105,910.00. The court then went on to apportion the award based on the original finding of the Commissioners.

Boatmen's and Cribbin–Seidel now appeal.[12] Basically, appellants contend the trial court erred in accepting the percentages for apportionment submitted by the appraiser for CDI. Appellants argue this appeal does not go to the credibility of the witnesses; rather, it asks simply for a proper application of the law to the facts available.

**9.** Economic rental refers to the fair market value of the leasehold interest.

**10.** Contract rental refers to the actual rent paid according to the terms of the lease agreement.

**11.** Here it would be a "Lease Comparison Approach."

**12.** As the prominent issue in both appeals is the same, we will address the appeals as one.

■ Our review here is governed by the standard set out in *Murphy v. Carron*, 536 S.W.2d 30, 31 (Mo. banc 1976). We will sustain the action of the trial court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law or unless it erroneously applies the law." *Id.* This court will utilize its power to set aside judgments of the trial court with caution and only upon a firm belief that the judgment is erroneous. *Id.*

■ Moreover, the admission or exclusion of evidence is soundly vested within the discretion of the trial judge. *Del–Mar Redevelopment Corp. v. Assoc. Garages*, 726 S.W.2d 866, 869 (Mo.App., E.D.1987). Errors regarding the admission or exclusion of evidence will result in reversal only if there is substantial and glaring injustice. *Id.* Conflicting opinions of experts must be weighed by the trier of fact and considered in light of matters such as the knowledge, experience, and attention given to the case. *Richard B. Curnow, M.D., Inc. v. Sloan*, 625 S.W.2d 605, 607 (Mo. banc 1981). Whether an expert's opinion is based upon and supported by facts in evidence sufficient to support that opinion is a question of law for the court. *Holtgrave v. Hoffman*, 716 S.W.2d 332, 335 (Mo.App., E.D.1986).

■ After a thorough reading of the briefs and an extensive review of the transcripts, legal files, and other accompanying documents, we find the trial court abused its discretion in relying upon the evidence presented by CDI. In ruling as such, we focus primarily on the testimony of the appraisers, and note that CDI, as lessee, carried the burden of proving the existence of a "bonus value". *Land Clearance for Redev. v. Coen & Co.*, 773 S.W.2d 465, 472 (Mo.App., W.D.1989).

The expert appraiser for appellants testified he was in agreement with CDI's expert that the proper method to be utilized here to determine the extent of the parties' interests was the bonus value method of valuation, i.e. the difference between the market rental and the contract rental for the affected leaseholds. *See, Land Clearance For Redevelop. Corp. v. Doernhoefer*, 389 S.W.2d 780, 784 (Mo.1965). Appellants' appraiser relied on the *Doernhoefer* case for the factors to be considered in determining the economic value of a leasehold:

the value of the leasehold should be determined from the testimony of qualified expert witnesses as that value which a buyer under no compulsion to purchase the tenancy would pay to a seller under no compulsion to sell, taking into consideration the period of the lease yet to run, including the unexercised right of renewal, the favorable and unfavorable factors of the leasehold estate, the location, type and construction of the building, the business of the tenant, comparable properties in similar neighborhoods, present market conditions and future market trends, and all other material factors that would enter into the determination of the reasonable market value of the property.

*Id.*

Considering each of these factors, appellants' expert opined that the leaseholds at issue had no economic or market value. After carefully reading the REA, he specifically found the REA acted as an unfavorable characteristic to the leasehold, as it limited the use to free parking for Galleria tenants and customers and provided for no additional development. The expert also testified he was unable to find evidence of comparable properties in similar neighborhoods. The leaseholds at issue involved properties associated with a regional mall which were encumbered by the REA and encumbered by zoning restrictions.[13] The appraiser for appellants was unable to locate similar leaseholds with similar restrictions upon which to base an estimate of market value.

Additionally, appellants' expert testified that, besides the economic value/contract value approach, he also considered a second

---

**13.** The properties at issue were subject to zoning restrictions whereby development could not be had on parcels of land consisting of fewer than 2½ acres.

means of pursuing a bonus value. Relying on *Coen*, 773 S.W.2d at 473, the appraiser established that one could consider what the lessee lost, functionally and economically, to determine the existence of a bonus value. Keeping in mind the loss of accessibility, loss of actual land and the physical alteration of the property, appellants' appraiser found no change in the economic or functional use of the leaseholds. On cross-examination, even the appraiser for CDI agreed that CDI lost no parking spaces as a result of the condemnation. As such, appellants' expert could not determine the value a buyer under no compulsion to purchase the tenancy would pay to a seller under no compulsion to sell the tenancy. *See, Doernhoefer*, 389 S.W.2d at 784. Based on his research, then, the appraiser for appellants contended the fee owners should receive the entirety of the Commissioners' Awards.

The expert appraiser testifying on behalf of CDI confirmed he began his investigation in this matter with a preconceived notion that there was a bonus value for the affected leaseholds. He then relied on the *Doernhoefer* factors to determine the amount of the bonus value. Contrary to appellants' expert, the appraiser for CDI viewed the REA's effect on the leaseholds in a favorable manner as it provided cross-easement privileges allowing traffic to move freely through the shopping center. He also saw the REA as a means of guaranteeing the upkeep and maintenance of the encumbered properties.

CDI's expert testified he discovered no sales of long-term ground leases. However, he did find 13 properties which he viewed as comparable to those at issue. These comparables were identified as outlots, part of an overall development, subject to REAs and cross-easements. The appraiser found that the average lease rate for the comparables was $1.67 per square foot. With this in mind, CDI's appraiser then assessed a premium based on the Galleria location and determined the economic value of the affected leaseholds to

be $3.00 per square foot. Because the current rent paid by CDI per square foot was only $.15 for the Sansone Tract and $.19 for the Cribbin–Seidel Tract, the expert for CDI identified a "bonus value."

■ Relying on the estimations of its appraiser, CDI submitted Proposed Findings of Fact and Conclusions of Law contending the proper distribution could be achieved by presenting 95% of the Commissioners' Awards to CDI and 5% to the fee holders. The court adopted these percentages nearly verbatim, awarding 95.4% of the awards to CDI and 4.6% to the fee holders.[14]

The appraiser for the fee holders testified he earned his real estate license in 1972, which he later converted to a broker's license. He is a member of the Appraisal Institute, a senior accreditor of appraisers in the American Society of Appraisers, a senior member of the National Association of Independent Fee Appraisers and is currently listed with the State of Missouri as a general real estate appraiser. Appellants' expert received a Bachelor's Degree from Washington University, a Masters of Science Degree from Washington University, and an M.B.A. from Southern Illinois University. He has also acted as an instructor teaching appraisal-related courses for Lindenwood College, Washington University and the University of Missouri. He teaches on a National level for the American Society of Appraisers as well. Appellants' expert indicated he has been actively involved in appraisal work since the mid–1970s and has had occasion in the past to prepare opinions of value for purposes of apportionment hearings and condemnations.

CDI's expert testified he has a Bachelor's Degree in Business Administration from the University of Missouri at St. Louis. He is currently a member of the Appraisal Institute. He is a licensed real estate broker and a licensed appraiser for the State of Missouri. The expert for CDI

---

14. We note that a court's acceptance of one party's proposed findings of fact and conclusions of law in a contested case is of doubtful use. *See, Leady v. State*, 714 S.W.2d 221, 222 (Mo.App., E.D.1986); *Binkley v. Binkley*, 725 S.W.2d 910, 911 (Mo.App., E.D.1987).

acknowledged this was the first apportionment proceeding he had ever done. Moreover, he agreed he had never applied the bonus method of valuation to property in an apportionment proceeding in the past.

Thus, the experts' own testimony regarding their education, qualifications and experience established that appellants' expert had more education and more professional affiliations than did CDI's expert. Additionally, the expert for appellants confirmed he had been involved in prior condemnation proceedings whereby he had utilized the bonus method of valuation specifically for apportionments. CDI's appraiser acknowledged he had never participated in an apportionment proceeding before and, thus, had never used the bonus valuation method in such a proceeding.

 This court recognizes the extent of an expert's training or experience in his chosen field goes to the weight rather than the admissibility of his testimony. *St. Louis Southwestern v. Federal Compress*, 803 S.W.2d 40, 43 (Mo.App., E.D.1990). However, it is also the rule that a witness's background must indicate a familiarity with the property at issue and a basis for that knowledge, as well as the ability to give information which will assist the factfinder in determining the ultimate issue. *Estate of Dennis*, 714 S.W.2d 661, 666 (Mo. App., W.D.1986). The testimony of CDI's appraiser falls short in this regard.

 At the apportionment hearings, the expert for CDI testified that he viewed the REA as a factor favorable to the affected leaseholds. He testified as to his "understanding" of a Reciprocal Easement Agreement. He then later confirmed that he had not read the REA in its entirety. The appraiser acknowledged he had not reviewed how the leasehold property was permitted to be used under the REA, although it was his "understanding" the property would only be used for free parking. When questioned as to his familiarity with the leases between CDI and Cribbin–Seidel impacting Parcel No. 2, CDI's expert testified he did read the leases. However, when this line of questioning was further

pursued, the expert admitted he had not read all of the documents associated with the leases and, in fact, did not know if there were any restrictions regarding assignment of the leases.

In relation to the comparable properties discovered by CDI's appraiser, he indicated he had actually read *some* of the leases, but in other cases he simply contacted developers to confirm the terms of the leases. In addition, when asked whether there were REAs associated with each of the alleged comparable tracts, the appraiser admitted there were REAs for some of them, but for others he was not sure. He also confirmed he did not know the terms of any of the REAs associated with the comparables. Based on the above, we find that CDI's expert lacked the necessary familiarity with or knowledge of the properties at issue, and was thus unable to provide any viable information upon which the court could base its determination of apportionment. *See, State, etc. v. Berkeley School Dist.*, 618 S.W.2d 195, 197–198 (Mo. App., E.D.1981).

 Additionally, we find the court's acceptance and reliance on the testimony of CDI's expert regarding the comparable properties an abuse of the court's discretion. We acknowledge that, as with any evidence, the admission of evidence regarding comparable properties is a matter largely in the discretion of the trial judge. *State ex rel. Mo. Hwy. & Transp. v. Roth*, 687 S.W.2d 662, 666 (Mo.App.E.D. 1985). "That discretion is abused only when the trial court's ruling runs against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to show a lack of careful consideration and shock the sense of justice ...". *Id.*

The appraiser for CDI testified he found 13 pieces of property comparable to the property at issue. These comparables were identified as out-lot parcels of large retail developments. As far as we can discern, the similarities between the compa-

rables and the subject tracts stop here.[15] CDI's expert indicated the subject property is part of a regional shopping center, which is different from the comparable properties which were part of community-sized shopping centers. Regional centers, according to CDI's appraiser, have anchors, i.e. major department stores, and a wide variety of all types of retailers. Regional shopping centers do not have out-lot developments, as a general nature. Community-sized shopping centers generally provide high-volume retail within the center, as well as provide for high volume retail on the perimeter, or out-lot, parcels of the center.

The appraiser for CDI admitted that under each of the 13 comparable leases, it was assumed the property under the lease would be developed for some type of high-volume retail use. Pursuant to the REA, the Boatmen's and Cribbin–Seidel tracts could be used *only* for free parking for Galleria tenants and customers. As such, CDI's expert agreed the highest and best use for the comparable properties was for high volume retail development, whereas the highest and best use for the properties at issue was as free parking for the Galleria. Thus, one entering a lease involving one of the 13 related properties would have the opportunity to develop the property as an income-producing venture. However, one entering a lease for the Boatmen's or Cribbin–Seidel parcels would have no options regarding the use of that property other than providing free parking.[16]

In light of the above and the absence of similarities between the subject tracts and the 13 alleged comparable properties, we hold the trial court acted beyond its discretion in admitting evidence regarding the alleged similar properties.

Based on the foregoing, we find the trial court abused its discretion in relying on the testimony of CDI's expert and apportioning 95.4% of the Commissioners' Awards to CDI and 4.6% to the respective fee holders. We find no evidence of a bonus value in relation to the affected leasehold interests. We reverse the order of the trial court and hold that appellants are entitled to 100% of the Commissioners' Awards for their respective tracts.[17]

Reversed.

SMITH, and STEPHAN, JJ., concur.

---

**15.** *See, Roth,* 687 S.W.2d at 666 (suggesting that a comparison of the sale of oranges would not be probative as to a sale of apples).

**16.** CDI suggests that pursuant to the recent Eastern District opinion, *Missouri Baptist Children's Home v. State Tax Commission of Missouri,* No. 62053 —— S.W.2d —— (May 4, 1993), the restricting qualities of the REA should not be considered in determining the market value of the subject properties. However, we find the cases easily distinguishable. *Missouri Baptist* involves an appeal by a property owner from the State Tax Commission's ruling regarding the assessment of commercial real estate for real estate tax purposes pursuant to RSMo Chapter 137. RSMo § 137.115 requires the assessor to determine the "true value" of the property at issue for assessment purposes. Rather than "true value," the case before us requires a determination as to the "bonus value" of property. In light of the factors set out in *Doernhoefer,* any favorable or unfavorable elements associated with the leasehold must be weighed. As such, the REA and its accompanying restrictions have been properly considered by this court.

**17.** Because of our holding here, the remaining points raised by appellants are now moot, and we need not consider them.