JOSEPH M. ELLIS, Judge.
 

 Appellants, Dr. Henrik A. Knudsen and his wife Rogene F. Knudsen, appeal a judgment of the Circuit Court of Jackson County in their civil action for apportionment and distribution of an award of damages which was paid into the registry of the court after certain real property they owned was condemned. The Knudsens claim the trial court erred in distributing a part of the award to Respondent, Dr. Joan R. Walker, since Dr. Walker was not entitled to any distribution whatsoever. We reverse and remand for entry of a new judgment in favor of Dr. Walker.
 

 The underlying facts of this case are undisputed. In 1965, the Knudsens purchased real estate located at 1520 South Noland Road in Independence, Jackson County, Missouri (“the Property”). The Property, on which a building had been constructed, was used as a dental office beginning in 1967, and Dr. Knudsen practiced dentistry there until he retired in 2001. In 1977, the Knudsens built an addition onto the front of the budding, connecting to the building’s existing plumbing and electrical systems. The reception room for the dental offices in the building was located in the front of the building and was shared by everyone in the building. There was a parking lot in the rear of the building that was also shared by the occupants of the building, as well as by patients.
 

 At some point prior to 1996, Appellants began renting space in the building to another dentist, Dr. Branstetter. At this time, Dr. Walker worked for Dr. Knudsen. Dr. Branstetter subsequently sold his dental practice to Dr. Walker, who, on November 15, 1996, entered into a written agreement with the Knudsens to occupy the office space that had formerly been occupied by Dr. Branstetter. Pursuant to the terms of the agreement, Dr. Walker took possession of her office space in the building on November 15,1996.
 

 The written agreement between the Knudsens and Dr. Walker (“the Agreement”) was titled “PROFESSIONAL OFFICE LEASE AGREEMENT.” It was signed by the Knudsens as “Landlords” and by Dr. Walker as “Tenant,” and throughout the text of the Agreement, the Knudsens were referred to as “landlord” and Dr. Walker was referred to as “tenant.” The Agreement provided that it was a contract to “lease” and “rent” office space in the building to Dr. Walker, who agreed to “accept the Leased Premises in [their] present condition and as suited for the uses intended by” her. That intended use was specified in the Agreement, which further provided that “[t]he Leased Premises shall be used for a professional office space.”
 

 The professional office space leased to Dr. Walker pursuant to the Agreement was described as “office space consisting of 1,164 square feet, more or less,” and was further described as comprising “approximately 46.6% of the total leasable space
 
 *423
 
 within the office building.” The diagrams attached to the Agreement indicate that the leased space included a common reception area and a common area in the basement that were to be shared by all occupants. The Agreement also provided that the Knudsens would maintain the building’s rear parking lot, which Dr. Walker and her patients were permitted to use.
 

 The Agreement expressly provided that “[t]his contract shall create the relationship of Landlord and Tenant between the parties thereto” and that “Landlord gives to Tenant exclusive control of the Leased Premises.” In addition, the Agreement gave Dr. Walker the right to “assign this lease or sublease all or portions of the Leased Premises to others if such operation is within the purposes for which the Leased Premises may be used,” as long as she obtained the prior written consent of the Knudsens, which was not to be unreasonably withheld.
 

 The Agreement specified an initial lease term of five years at a basic monthly rental rate of $775 per month, and required Dr. Walker to pay a $775 security deposit for the leased space.
 
 [1]
 
 The term of the Agreement as initially executed was from November 15, 1996, to November 14, 2001. The Agreement also specified that Dr. Walker had the option to renew the lease for an additional five-year term upon giving written notice to the Knudsens of her intent to do so at any time prior to three months before the end of the original term of the lease. If renewed, the basic monthly rental rate, during each subsequent year following the end of the original five-year term of the Agreement, was to incrementally increase by an amount related to the increase in the Consumer Price Index (CPI) as computed and published by the United States Department of Labor Statistics for the area encompassing the Property-
 

 On December 5, 2000, Dr. Walker’s attorney sent a letter to the Knudsens via certified mail giving them timely notice of Dr. Walker’s desire and intent to renew the Agreement for a second five-year term. On June 1, 2001, Dr. Knudsen retired and sold his dental practice to a third party, Dr. Rodger Suchman. Dr. Such-man wished to rent, as a month-to-month tenant only, the office space previously occupied by Dr. Knudsen in the building, and although this space was slightly larger than the space being rented to Dr. Walker, the rental fee was set at $775 per month, which, after the CPI adjustment provided for in the renewed Agreement between the Knudsens and Dr. Walker, was slightly less than the basic monthly rental rate then being paid by Dr. Walker for the office space she was occupying.
 

 On August 30, 2001, a Petition for Condemnation was filed by the Santa Fe Trail Neighborhood Redevelopment Corporation (“Santa Fe”) requesting, among other things, that all of the real property owned by the Knudsens which was situated in the Martha’s Vineyard Subdivision be condemned as blighted and in need of redevel
 
 *424
 
 opment. This included not only the Property, but also an adjacent vacant lot owned by the Knudsens. On November 14, 2001, the trial court entered an order condemning both pieces of real estate.
 

 On March 11, 2002, pursuant to a stipulation between the Knudsens and Santa Fe, the trial court entered a consent judgment reflecting that the Knudsens had agreed to accept the sum of $275,000 in full satisfaction and release of their claim for damages arising from Santa Fe’s condemnation of the Martha’s Vineyard Subdivision real estate owned by the Knud-sens. Santa Fe was ordered to pay $275,000 into the court registry as damages for the takings by Santa Fe, and the trial court also ordered Santa Fe to pay “reasonable tenant moving expenses.”
 

 On March 21, 2002, Santa Fe deposited $275,000 into the court registry. Although the November 14, 2001 order of condemnation expressly granted Santa Fe the right to take possession of the condemned real estate at that time, Santa Fe did not exercise this right. Instead, Dr. Walker continued in uninterrupted possession and control of her office space in the budding on the Property until she vacated the premises on December 31, 2002.
 

 As authorized by § 523.053.1,
 
 [2]
 
 on March 25, 2002, the Knudsens filed a motion requesting that the condemnation damage award be apportioned to reflect the respective legal interests of both themselves and Dr. Walker in the Property, a copy of which they served on Dr. Walker. Although this motion described Dr. Walker as a “tenant” of the Property who was “entitled to [receive] moving expenses” from Santa Fe under the terms of the March 11, 2001 consent judgment and acknowledged that Dr. Walker claimed a leasehold interest in the Property pursuant to the Agreement, the motion further requested an order commanding the court clerk to disburse to the Knudsens all of the $275,000 being held in the court registry.
 

 On March 28, 2002, Dr. Walker filed a response to the Knudsens’ motion in which she claimed a bonus value leasehold interest in the condemnation proceeds pursuant to the renewed Agreement and requested that the trial court retain the proceeds in the registry “until such time as the Court can determine the interest of the various claimants to this sum.” On April 28, 2003, the trial court entered an order of partial distribution in which it directed, in accordance with a stipulation between the parties, that the sum of $225,000 be paid to the Knudsens out of the registry and that the remaining $50,000, which was still the subject of a dispute between the Knudsens and Dr. Walker, be placed in an interest-bearing bank account until further order of the court.
 

 In November 2003, the trial court held a hearing on the Knudsens’ motion for apportionment and distribution and received evidence presented by the Knudsens and Dr. Walker. Dr. Walker presented the testimony of an expert real estate appraiser, William Davis, while the Knudsens also presented the competing testimony of another expert real estate appraiser, Larry Witt. After considering this and other evidence, on December 12, 2003, the trial court entered a judgment finding that with regard to the Property in question, Dr. Walker’s proportionate share of the condemnation damages that had been paid into the registry by Santa Fe was $47,000. On January 12, 2004, the trial court issued an amended judgment finding that Dr. Walker was also entitled to recover the interest that had accrued on her $47,000 proportionate share, leading to the instant appeal.
 

 
 *425
 
 The familiar standard set forth in
 
 Murphy v. Carron,
 
 536 S.W.2d 30, 32 (Mo. banc 1976), governs appellate review of a trial court’s order or judgment apportioning, pursuant to § 523.053, a damage award in a condemnation proceeding.
 
 State ex rel. Mo. Highway & Transp. Comm’n v. Gillespie,
 
 86 S.W.3d 459, 463 (Mo.App. W.D.2002). “Under that standard, we are to sustain the action of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. We should utilize our power to set aside a judgment with caution and only upon a firm belief that it was erroneous.”
 
 State ex rel. Mo. Highway & Transp. Comm’n v. Quiko,
 
 923 S.W.2d 489, 493 n. 2 (Mo.App. S.D.1996) (internal citations omitted).
 

 The Knudsens raise five points on appeal, which we will address out of their original order. In their second point, the Knudsens claim the trial court erred in apportioning any part of the condemnation damage award to Dr. Walker because she did not have a compensable interest in the Property in that the Agreement was merely a license revocable at will, not a lease creating a landlord-tenant relationship. We disagree. While the Knudsens are correct that one whose right to enter real estate owned by another is merely a license does not have a compensable legal interest in the property if it is subsequently condemned, under the plain terms of the Agreement, Dr. Walker was clearly a lessee, not merely a licensee.
 

 The difference between a lease and a license is a “technical distinction which is ‘often difficult to determine.’ ”
 
 St. Louis Southwestern Ry. Co. v. State Tax Comm’n,
 
 319 S.W.2d 559, 564 (Mo.1959) (quoting 51 C.J.S.
 
 Landlord & Tenant
 
 § 202e(2)). This distinction is critical in condemnation cases because while “a leaseholder possesses an interest in property for which he must be compensated in condemnation!;,] a mere licensee generally does not.”
 
 State ex rel. State Highway Comm’n v. Johnson,
 
 592 S.W.2d 854, 857 (Mo.App. E.D.1979).
 

 In order for one to have a com-pensable interest in a condemnation proceeding, “[t]he interest held [in] the property for which compensation must be rendered ... must consist of some definite right of domination in and over the [property], such as the right of user, or exclusion, or disposition. A mere contractual relationship is not sufficient in itself.”
 
 Millhouse v. Drainage Dist. No. 48 of Dunklin County,
 
 304 S.W.2d 54, 58 (Mo.App. S.D.1957). Other than to show their express intent, it matters not what the parties themselves call them agreement.
 
 Friend v. Gem Int’l, Inc.,
 
 476 S.W.2d 134, 137 (Mo.App. E.D.1971). “Rather, the nature of the relationship depends upon how it fits within the standards set by the law.”
 
 Id.
 
 “The denomination of an instrument as a ‘license’ or a ‘lease’ by the parties cannot alter or affect its true nature. It assumes its correct appellation by reason of the rights and obligations created by its terms under the law.”
 
 Id.
 

 A lease is generally regarded as a conveyance or grant of an estate in real property for a limited term with conditions attached, and in this connection has been defined as a conveyance to a person for life or years, or at will, in consideration of a return of rent or other recompense, and as a conveyance of any lands or tenements, usually in consideration of rent or other annual recompense, made for life, for years, or at will, but always for a less time than the lessor has in the premises.
 

 State ex rel. St. Louis County v. Evans,
 
 346 Mo. 209, 139 S.W.2d 967, 969 (1940) (internal quotation marks omitted). Thus
 
 *426
 
 an “ ‘estate’ in the leasehold context requires simply a conveyance of a lessor’s interest in real property for a limited term.”
 
 Chubb Group of Ins. Cos. v. C.F. Murphy & Assocs., Inc.,
 
 656 S.W.2d 766, 778 (Mo.App. W.D.1983).
 

 A license is only a privilege to enter certain premises for a specific purpose. A license does not vest any title, interest or estate in the licensee and may be revoked at the will of the licensor. In contrast, a lease is “any agreement which gives rise to relationship of landlord and tenant” and said “contract is for exclusive possession of tenements for a determinate period.” A landlord-tenant relationship is created when: (1) there is reversion in the landlord; (2) creation of an estate in the tenant either at will or for a term less than that which the landlord holds; (3) transfer of exclusive possession and control of the tenant; and (4) a contract.
 

 Kimack v. Adams,
 
 930 S.W.2d 505, 507 (Mo.App. E.D.1996) (internal citations omitted). As this court has put it:
 

 [T]he principal test for determining whether the relationship created is that of landlord and tenant rather than that of licensor and licensee is whether the contract confers exclusive possession of the premises as against all the world, including the owner, and a mere permission to use land, dominion over it remaining in the owner and no interest in, or exclusive possession of, it being given, is but a license.
 

 Wandell v. Ross,
 
 241 Mo.App. 1189, 245 S.W.2d 689, 693 (1952) (internal quotation marks and original emphasis omitted).
 

 Whether a particular agreement is a lease or a license depends on whether or not it shows the intention to establish the relation of landlord and tenant, such intention being determined from a consideration of the entire instrument, and the circumstances under which it was made.... Definiteness of the space to be occupied is one of the criteria for determining whether the instrument is a lease.
 

 Johnson,
 
 592 S.W.2d at 857-58 (internal quotation marks omitted).
 

 Applying the facts to this well-developed body of Missouri law, it is clear that the contractual Agreement between the Knud-sens and Dr. Walker was a lease creating a landlord-tenant relationship and a leasehold estate, rather than merely a revocable license. To begin with, the technical words of a lease appear throughout the entire Agreement, which, when considered along with the circumstances under which it was made, is a very strong indication that from the outset, both parties intended it to be a lease rather than a license.
 

 Moreover, the Knudsens held a fee simple interest in the Property, while Dr. Walker was granted a possessory interest therein for only a limited term,
 
 i.e.,
 
 five years. The parties mutually agreed to a fixed rental rate for a definite amount of office space for the period of five years, and at the conclusion of this period, possession of that office space would revert to the Knudsens unless the Agreement was renewed.
 
 See Kirk v. Mattier,
 
 140 Mo. 23, 41 S.W. 252, 254 (1897) (noting that contract language specifying “the term of years and the fixed rent” was “inconsistent with a mere license.”)
 

 Furthermore, Dr. Walker’s actions of paying the security deposit and making regular monthly rental payments to the Knudsens, along with her actual continuous possession and control of the office space for the purposes authorized by the terms of the Agreement, fulfilled the express intention of the parties that Dr. Walker enjoy exclusive possession and control thereof during the term of the Agreement. The Agreement further granted Dr. Walker the right to assign her
 
 *427
 
 interests under the Agreement or sublease all or any portion of the office space to a third party for similar uses upon prior written consent of the Knudsens, which consent was not to be unreasonably withheld. These factors are all inconsistent with the grant of only a license, because “[o]ne of the essential characteristics [of a license] is the absence of the right to possession of the land.”
 
 Friend,
 
 476 S.W.2d at 138.
 

 In addition, the Agreement nowhere states that it could be revoked at the whim or pleasure of the Knudsens. This, too, is entirely inconsistent with a mere license, because “[t]he essential attribute of a bare license is the right of the grantor to freely revoke it any time.”
 
 Kansas City Area Transp. Auth. v. Ashley,
 
 485 S.W.2d 641, 644 (Mo.App. W.D.1972). To the contrary, the Agreement gave Dr. Walker the option to renew the Agreement for an additional five-year term simply by giving timely written notice to the Knudsens of her intent to do so. “The holder of an option to renew a lease has an interest in the land. The right of renewal constitutes a part of the tenant’s interest in the land, and forms a substantial and integral part of the agreement ... It is a part of the estate granted, an interest in or encumbrance on the property.”
 
 Land Clearance for Redevelopment Corp. v. Doernhoefer,
 
 389 S.W.2d 780, 785 (Mo.1965) (internal citations and quotations omitted). For this reason, if no other, it can hardly be said that Dr. Walker occupied the office space as only a licensee.
 

 Notwithstanding all this, the Knudsens cite the Agreement as providing that “no estate shall pass out of the Landlord,” claiming that Dr. Walker thereby contracted away her right to claim any estate in the Property — even a leasehold. However, as noted by Dr. Walker, while those words do indeed appear in the Agreement, they have been taken out of their proper context. In its entirety, the quoted clause reads as follows:
 

 NO ESTATE IN LAND: This contract shall create the relationship of Landlord and Tenant between the parties thereto: no estate shall pass out of Landlord.
 

 Taking the Agreement as a whole into consideration, as we must, we think the only reasonable reading of this clause is that the portion cited by the Knudsens is intended to clarify that the Agreement grants Dr. Walker only a temporary
 
 (i.e.,
 
 leasehold) interest in the Property as opposed to a permanent one
 
 (e.g.,
 
 a fee simple interest).
 
 See, e.g., White v. Keller,
 
 114 Mo. 479, 21 S.W. 860, 861 (1893).
 

 In short, “[b]y every test known to the law this instrument is a lease.”
 
 Kirk,
 
 41 S.W. at 254. Accordingly, we hold that the Agreement between the Knudsens and Dr. Walker was not merely a revocable privilege to enter the Property for a specific purpose, but a fully executed lease which had been properly renewed, by Dr. Walker and at her option, for a new five-year term nearly nine months before Santa Fe commenced condemnation proceedings. Point denied.
 

 In their first point, the Knud-sens argue the trial court erred in apportioning any part of the condemnation damage award to Dr. Walker because she did not have a compensable interest in the Property in that the Agreement had terminated since it provided that the lease term ceased at the time actual possession of the Property was taken by Santa Fe. We disagree, because under the plain terms of the Agreement, Dr. Walker’s right to recover her proportionate share of the condemnation damages paid into the registry by Santa Fe was not impaired or extinguished.
 

 Where, as here, a tract being condemned is subject to a leasehold inter
 
 *428
 
 est and a single award of damages is made without regard to the lessee’s claim, that amount may be allocated between the owner of the fee interest and the owner of the leasehold interest pursuant to the procedure provided in § 523.053.
 
 State ex rel. Mo. Highway & Transp. Comm’n v. Rantz,
 
 43 S.W.3d 436, 440 (Mo.App. S.D.2001). It is then “up to the landlord and the tenant to settle the division thereof by agreement or by litigation.”
 
 Land Clearance for Redevelopment Auth. of Kansas City v. Ridge,
 
 781 S.W.2d 104, 106 (Mo.App. W.D.1989); § 523.053.1. “The con-demnor has no responsibility for the apportionment of a damage award, nor is it required to trace the distribution of the proceeds to the [competing] parties.”
 
 State ex rel. State Highway Comm’n v. Morganstein,
 
 588 S.W.2d 472, 477 (Mo. banc 1979) (internal citation omitted).
 

 Under Missouri law, the general rule is that “damages in condemnation require the factfinder to measure the value of the property prior to the taking against its value after the taking. The date of the taking is the date upon which the condem-nor pays the [damage] award into court.”
 
 State ex rel. Mo. Highway & Transp. Comm’n v. Starling Plaza P’ship,
 
 832 S.W.2d 518, 520 (Mo. banc 1992) (internal citations omitted). Moreover, “ownership of property for purposes of a condemnation action is determined at the time the petition in condemnation is filed.”
 
 Id.
 
 at 521. Accordingly, to have a compensable interest in a condemnation award of damages, any claimant thereto must show that it had an interest in the condemned property at the time the condemnor commenced condemnation proceedings.
 
 Ticor Title Ins. Co. v. Land Clearance for Redevelopment Auth. of Kansas City,
 
 729 S.W.2d 236, 238 (Mo.App. W.D.1987). As discussed
 
 supra,
 
 Dr. Walker made such a showing, as she demonstrated that she held a valid, unexpired leasehold interest in the Property on August 30, 2001, the date Santa Fe filed its Petition for Condemnation.
 

 Nevertheless, the Knudsens claim that the Agreement itself divested Dr. Walker of any legally compensable interest she might otherwise have had in the Property. They rely on the following provision of the Agreement:
 

 CONDEMNATION: If the Leased Premises, or any portion thereof should be condemned by any legally constituted authority for any purpose, then the term of this lease shall cease from the date when possession thereof is taken, and rental shall be accounted for as between Landlord and Tenant as of said date. Such termination, however, shall be without prejudice to the rights of either Landlord or Tenant, to the extent of their respective interest, to recover compensation and damage caused by condemnation from the condemnor. Neither party shall have any rights in any award made to the other by any condemnation authority, notwithstanding termination of this lease.
 

 The Knudsens claim that by agreeing to this provision, Dr. Walker “contracted away any rights that she might have otherwise had to share in any condemnation proceeds” under Missouri law. Since “[t]he interpretation to be given a contract on undisputed facts is a question of law,”
 
 Stotts v. Progressive Classic Ins. Co.,
 
 118 S.W.3d 655, 662 (Mo.App. W.D.2003), our review of this issue is
 
 de novo. City of Harrisonville v. Pub. Water Supply Dist. No. 9 of Cass County,
 
 49 S.W.3d 225, 230 (Mo.App. W.D.2001). “The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent. The terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning.”
 
 Dunn Indus. Group,
 
 
 *429
 

 Inc. v. City of Sugar Creek,
 
 112 S.W.3d 421, 428 (Mo. banc 2003) (internal citation omitted).
 

 The first sentence of the condemnation clause provides that vis-á-vis the two parties to the lease, the term of the lease was to come to an end and the final rental payment to be determined, not upon the date condemnation proceedings commenced or the leased premises were condemned, but when Santa Fe
 
 took actual possession thereof.
 
 The second sentence provides that notwithstanding this, “[s]uch termination ... shall be without prejudice to the rights of either Landlord or Tenant, to the extent of their respective interest, to recover compensation and damage caused by condemnation from the condem-nor.” This means that neither party’s right to recover damages from Santa Fe for its respective compensable interest in the condemned Property was to be impaired, compromised, or eliminated by the lease termination provision contained in the first sentence. Finally, the third sentence provides that, again notwithstanding the lease termination provision contained in the first sentence, neither party “shall have any rights in any award made to the other by any condemnation authority.” This simply means that neither the Knud-sens nor Dr. Walker had any rights in any award of condemnation damages made to the other by Santa Fe.
 

 In urging a contrary result, the Knud-sens rely heavily on the Eastern District’s decision in
 
 Bi-State Dev. Agency v. Nikodem,
 
 859 S.W.2d 775 (Mo.App. E.D.1993), which they characterize in their brief as the “ruling case law that controls this case.” That reliance is misplaced, though, because the contract at issue in
 
 Bi-State
 
 was dissimilar to the Agreement here. In
 
 Bi-State,
 
 the court considered a lease provision that read as follows: “In the event all of said premises shall be appropriated or taken under the power of eminent domain by any public or quasi-public authority, this lease shall terminate and expire
 
 as of the date of such taking;
 
 and the Lessor and Lessee shall thereupon be released from any further liability hereunder.”
 
 Id.
 
 at 777 (emphasis added). Based on this language, the court held that inasmuch as the lease expired by its own terms at the time of the taking, the lessee had no unexpired compensable interest in the condemned property at the time of the taking and was, therefore, not entitled to any portion of the condemnation award.
 
 Id.
 
 at 779-80. “With a termination clause such as the one at issue here,” the Eastern District reasoned, “the leasehold interest terminates and expires by the terms of the very contract that created the interest in the first place. Thus, no property interest of the lessee has been appropriated for public use and there is no constitutional right to compensation.”
 
 Id.
 
 at 780.
 

 Here, however, the Agreement does not call for termination of the lease upon the date of the taking of the property by the condemnor. Instead, the Agreement provided that the term of the lease (and Dr. Walker’s continued obligation to pay rent to the Knudsens) was to come to an end when the condemnor (Santa Fe)
 
 took actual possession of the condemned Property
 
 (which did not take place until some time after December 31, 2002),
 
 not at the time of the taking
 
 (which took place on March 21, 2002, more than nine months earlier). Because the lease was still in full force and effect at the time of the taking, which, as noted
 
 supra,
 
 is the critical date for determining damages in condemnation,
 
 Bi-State
 
 is inapposite. Furthermore, and even more critically, unlike the lease in
 
 Bi-State,
 
 the Agreement contained a separate clause expressly providing that Dr. Walker’s right to recover damages from Santa Fe for her leasehold interest in the condemned Property was not to be prejudiced by the lease termination provision. Thus,
 
 *430
 
 it cannot be said that she thereby affirmatively waived or surrendered her right, as a leaseholder under Missouri law, to her proportionate share of the condemnation damage award. Rather, the manifest intent of the parties to the Agreement was that, with regard to the “rights of either Landlord or Tenant, to the extent of their respective interest, to recover compensation and damage caused by condemnation from the condemnor,” the Agreement should be construed as if there had been no lease termination clause at all. Indeed, in
 
 Bi-State,
 
 the court declared:
 
 “Absent a termination clause,
 
 the lease terminates because the leasehold interest has been appropriated for public use, thus giving rise to a right of compensation.”
 
 Id.
 
 (emphasis added).
 

 For these reasons, we hold that the trial court properly concluded that the Agreement’s condemnation clause did not operate to impair or extinguish Dr. Walker’s right, under Missouri law, to recover her proportionate share of the condemnation damages paid into the registry by Santa Fe. Point denied.
 

 In their third point, the Rnudsens claim the trial court erred in entering judgment in favor of Dr. Walker for the amount of the bonus value computed by her expert witness, William Davis, since the evidence he relied on “to establish both market rent and contract rent was based upon incorrect figures, irrelevant facts and improper methodologies.”
 

 The proper measure of damages for condemnation of a lessee’s interest in real property is the bonus value of the unexpired term of the lease as measured by the difference between the market rental and the contract rental for the use and occupancy of the affected leasehold. Doe
 
 rnhoefer,
 
 389 S.W.2d at 784. Thus, “the lessee of property taken by eminent domain is entitled to the ‘bonus value’ of the unexpired term of his or her lease, or the amount by which the fair market rental value of the use and occupancy of the land for the remainder of the lease term exceeds the rent specified in the lease.”
 
 Osborn v. Home Ins. Co.,
 
 914 S.W.2d 35, 37-38 (Mo.App. E.D.1996). The lessee bears the burden of proving the existence of a bonus value,
 
 St. Louis County v. Boatmen’s Trust Co.,
 
 857 S.W.2d 453, 457 (Mo.App. E.D.1993), and, as here, “where a condemnation award is to be apportioned between a single lessee and a single lessor, the entire award must be allocated to the lessor unless the lessee can prove the existence of a bonus value.”
 
 Land Clearance for Redevelopment Auth. of Kansas City v. W.F. Coen & Co.,
 
 773 S.W.2d 465, 472 (Mo.App. W.D.1989).
 

 In
 
 Doernhoefer,
 
 the Missouri Supreme Court discussed the factors to be considered in determining the market value of a leasehold:
 

 [T]he value of the leasehold should be determined from the testimony of qualified expert witnesses as that value which a buyer under no compulsion to purchase the tenancy would pay to a seller under no compulsion to sell, taking into consideration the period of the lease yet to run, including the unexercised right of renewal, the favorable and unfavorable factors of the leasehold estate, the location, type and construction of the building, the business of the tenant, comparable properties in similar neighborhoods, present market conditions and future market trends, and all other material factors that would enter into the determination of the reasonable market value of the property.
 

 389 S.W.2d at 784. Moreover, “[t]he admission or exclusion of evidence in condemnation cases is within the discretion of the trial court, and errors will not result in reversal unless there is a substantial or glaring injustice.”
 
 Quiko,
 
 923 S.W.2d at
 
 *431
 
 498. In reviewing the admissibility of such evidence on appeal, “we are mindful that the trial court is allowed wide latitude in the admission of evidence because it is presumed that it will not give weight to that evidence which is incompetent. It is, therefore, difficult to base reversible error on the erroneous admission of evidence in a court-tried case.”
 
 Id.
 
 (internal citation omitted). The conflicting opinions of experts in condemnation cases such as this “must be weighed by the trier of fact and considered in light of matters such as the knowledge, experience, and attention given to the case. Whether an expert’s opinion is based upon and supported by facts in evidence sufficient to support that opinion is a question of law for the court.”
 
 Boatmen’s Trust, 857
 
 S.W.2d at 457 (internal citations omitted).
 

 As mentioned
 
 supra,
 
 during the apportionment hearing, Dr. Walker presented the testimony of William Davis, who had been in the appraisal business for 45 years and who opposing counsel stipulated was an expert in his field. Davis had extensive experience in appraising leaseholds and had previously appraised leaseholds for such large commercial entities as Kansas City International Airport and Trans World Airlines. He estimated that he had previously appraised the value of twenty to thirty different leaseholds. Davis conducted an appraisal of Dr. Walker’s leasehold interest in the Property and prepared a report setting forth his findings and the basis therefor. This report was admitted into evidence at the hearing.
 

 Davis indicated that he had conducted his appraisal pursuant to the regulations and rules of ethics of the Appraisal Institute and that he had followed uniform standards of professional practice in preparing the appraisal. He testified that he had conducted a careful inspection of both the inside and outside of the building that included taking photographs and making measurements. He also testified that, based upon his measurements, Dr. Walker was actually using a greater amount of square footage than was approximated in the Agreement.
 

 Davis explained that his methodology in appraising Dr. Walker’s leasehold interest consisted of first determining the market rent that should be attributed to the leasehold interest and then subtracting the contract rent actually paid for the leasehold interest. Davis acknowledged that Missouri courts commonly refer to this difference as the “bonus value.” Davis further indicated that, in appraising the value of a leasehold, it is important to distinguish between the “leasable space” and the “adjusted leasable space.” In essence, based on measurements he had made which were described in drawings set forth in his report, he explained that the adjusted leasa-ble space for the Property in question included both the space that was leased to Dr. Walker for her exclusive use and the common areas that were shared by all tenants of the building. Davis testified that he arrived at the adjusted leasable space by determining the square footage that was used exclusively by Dr. Walker, determining the square footage of the area that Dr. Walker shared with other occupants of the building, and then reducing the shared square footage by a percentage to reflect the fact that the area was shared. He ultimately arrived at a final figure of 1197.2 square feet for the adjusted leasable space for the Property.
 

 Davis testified that dental office space is usually more expensive than general office space because the main structure is commonly broken up into a number of smaller rooms and the space is designed to accommodate very specific equipment, such as built-in pneumatic and suction equipment. Thus, in determining market value for Dr. Walker’s leasehold interest, Davis considered eleven comparable properties that
 
 *432
 
 were also being leased for use as dental offices. Davis first determined the rent for each of the eleven comparable properties. He then adjusted these rents to reflect differences between the comparable properties and Dr. Walker’s leasehold, taking into account the following factors: (1) whether the dental equipment in the leased premises was installed by the lessor or the lessee; (2) the location of the leased property; (3) the age of the leased property; (4) the condition and design of the leased property; and (5) who paid utilities under the lease. After making these adjustments and accounting for other relevant data, Davis arrived at an average annual market rent of $14.25 per square foot. He then reduced this amount by an additional seven percent to account for lease vacancy rates and the general creditworthiness of dentists, arriving at an average annual rental rate of $13.25 per square foot and an average monthly rental rate of $1.10417 per square foot.
 

 Having arrived at an average monthly market rental rate of $1.10417 per square foot, Davis then determined the difference between this average market rate and the actual contract rate under the Agreement. In determining the amount that Dr. Walker was to pay in rent under the Agreement, Davis took into account the CPI adjustment called for by its terms. He then projected this difference over the term of the lease, including both renewal periods, and, using what he testified to be an appropriate discount factor under the circumstances of seven percent, discounted these amounts to present value to arrive at a final bonus value. Based on these calculations, Davis determined that the bonus value of Dr. Walker’s leasehold was $47,262.88, which he rounded down to $47,000 for the sake of simplicity.
 

 The Knudsens also presented testimony of an expert real estate appraiser, Larry Witt. Witt agreed that the proper method for determining bonus value is to compare the contract rate to the market rate, adjusting the comparable properties for factors such as age and location. While Witt identified two comparable properties that he had used in his appraisal, neither' of these properties was being used as a dental office at the time of his appraisal. Witt also expressed his disagreement with both the comparable properties used by Davis and Davis’ assessment of the value of those properties. In conjunction with Witt’s testimony, counsel for the Knudsens attempted to use an exhibit that set forth the CPI figures issued by the U.S. Department of Labor, but the trial court refused to admit this exhibit into evidence because counsel had failed to establish a foundation for its admission — a ruling the Knudsens do not challenge on appeal.
 
 [3]
 
 On rebuttal, Davis indicated that he did not believe Witt’s comparable properties provided an adequate basis for appraising the value of Dr. Walker’s leasehold because Witt’s appraisals were not sufficiently similar to the lease in question. In particular, Davis noted that Witt’s comparable properties were not being used as dental offices while Davis’ comparable properties were all being used as dental offices at the time of his appraisal.
 

 We need not further lengthen this opinion by conducting a detañed analysis of each and every alleged evidentiary deficiency identified by the Knudsens in their brief, all of which were fully addressed by Dr. Walker in her brief. From the foregoing discussion of the evidence, it is readüy apparent that Davis’ methodology was consistent with the factors set forth by our
 
 *433
 
 Supreme Court in
 
 Doemhoefer,
 
 and the trial court did not abuse its discretion or otherwise err in relying upon that evidence. Point denied.
 

 In their fourth point, the Knud-sens argue that the trial court erred in entering an
 
 in personam
 
 judgment against them and in favor of Dr. Walker since eminent domain actions are
 
 in rem
 
 proceedings and all judgments entered thereon must normally be rendered
 
 in rem
 
 against the condemnation proceeds, rather than
 
 in personam
 
 against one or more of the parties. In other words, they claim the trial court erred by stating, in its judgment, that Dr. Walker’s right of recovery was against the Knudsens personally rather than against the funds held in the trial court’s registry. Although this is a highly technical deficiency, we agree.
 

 “In Missouri it is well settled that eminent domain proceedings are
 
 in rem
 
 rather than
 
 in personam
 
 proceedings, and that when an award is made and paid into the registry of the court, the fund is substituted for the land and becomes the
 
 res.” State ex rel. State Highway Comm’n of Mo. v. Eilers,
 
 445 S.W.2d 374, 376 (Mo.1969). Thus, Santa Fe’s condemnation action was an
 
 in rem
 
 proceeding, and when the $275,000 damage award was deposited by Santa Fe into the court’s registry, it was substituted for the condemned property and became the
 
 res
 
 of the condemnation action.
 
 Id.
 
 So long as that sum or any portion thereof “was not distributed but remained in the registry of the court, the action continued to be one
 
 in rem
 
 rather than
 
 in personam.” Id.
 

 There is no question that the trial court’s original judgment of December 12, 2003, and its amended judgment of January 12, 2004, were both rendered against the Knudsens
 
 in personam.
 
 The relevant portion of the original judgment reads as follows: “IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Joan Walker be awarded judgment against Henrik A. Knudsen and Rogene Knudsen in the amount of $47,000 and for costs herein.” The amended judgment contains identical language, except that it added an award of the “interest accrued” on the amount awarded to Dr. Walker during the seven and a half months that had elapsed since the remaining $50,000 portion of the total condemnation award of $275,000 had been deposited into an interest-bearing bank account by order of the trial court.
 

 Based on the record before us, there is nothing to suggest that the $50,000 previously retained in the court’s registry is not still there. Since it appears from the record that the $50,000 remained undistributed and in the registry of the court at the time of the apportionment hearing, the proceeding was still
 
 in rem
 
 and the trial court could not enter an
 
 in personam
 
 judgment against the Knudsens.
 
 Id.
 

 [4]
 

 Consequently, both the original and amended judgments are void and the cause must be
 
 *434
 
 reversed and remanded to the trial court for its entry of a proper
 
 in rem
 
 judgment against the
 
 res.
 

 For this reason, we reverse and remand with instructions that the trial court enter a new judgment not inconsistent with this opinion. On remand, the trial court is instructed to enter a proper
 
 in rem
 
 judgment in favor of Dr. Joan R. Walker in the amount of $47,000, plus 94% ($47,000/$50, 000) of the interest which has accrued on the funds in the court’s registry. Likewise, the trial court is further instructed to enter a proper
 
 in rem
 
 judgment in favor of Dr. Henrik A. Knudsen and Rogene F. Knudsen in the amount of $3,000, plus 6% ($3,000/$50,000) of the interest which has accrued on the funds in the court’s registry.
 

 All concur.
 

 [1]
 

 . In addition to the rent and security deposit, Dr. Walker agreed to pay 46.6% of all monthly utility bills for the Property, as well as all ad valorem personal property taxes resulting from her occupancy thereof. She also agreed to pay for glass breakage, sign damage, and environmental cleanup, disposal, inspections, and fines, if any, and to maintain the leased space in good order and repair, excepting only those repairs expressly required to be made by the Knudsens. Dr. Walker further agreed to maintain, throughout the lease term and at her own expense, a general liability insurance policy covering the leased space, in amounts not less than $100,000 per person and $300,000 per occurrence for bodily injury claims and not less than $50,000 for property damage claims. Finally, Dr. Walker agreed not to store any substances containing components designated as hazardous, dangerous, toxic, or harmful without the prior written consent of the Knudsens.
 

 [2]
 

 . All statutory references are to RSMo 2000.
 

 [3]
 

 . Davis explained his reason for using certain CPI figures and Witt explained why he thought different CPI figures ought to apply. The trial court evidently accepted Davis’ CPI figures.
 

 [4]
 

 . If, on motion by the Knudsens, the entire $275,000 damage award had been distributed to them prior to the § 523.053 apportionment hearing, the trial court would have had jurisdiction to enter an
 
 in personam
 
 judgment against them and in favor of Dr. Walker for the amount due her as a result of the taking of the bonus value of her leasehold by Santa Fe. “[A] condemnation proceeding may be converted into one
 
 in personam
 
 if the defendants file a motion requesting payment to them of the amount of the [damage] award and the money is distributed to them. [Such a] request amounts to a general appearance for that purpose because as a result of the distribution of the money the
 
 res
 
 is gone and the action no longer can be one
 
 in rem.” Eilers,
 
 445 S.W.2d at 376-77. Since this did not occur here, we reject Dr. Walker’s claim that the
 
 in rem
 
 condemnation proceeding was converted to one
 
 in personam
 
 merely because the Knudsens filed a motion requesting payment to them of the entire amount of the damage award..